UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------ X
                             :

UNITED STATES OF AMERICA,      :

   -vs-                         :           22-cr-00259 (LDH)

STEVE SUNG CHON,              :

             Defendant.       :

------------------------------ X

## **<u>SENTENCING MEMORANDUM ON BEHALF OF STEVE CHON</u>**

KOSTELANETZ LLP

Bryan C. Skarlatos
7 World Trade Center
New York, New York 10007
(212) 808-8100
bskarlatos@kostelanetz.com


KETCHAM LAW PLLC

Brian P. Ketcham
52 Duane Street
New York, New York 10007
(212) 518-6380
bk@ketchampllc.com


*Attorneys for Steve Sung Chon*

# TABLE OF CONTENTS

I.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE .................................... 2

II.   PERSONAL HISTORY .................................................................. 3

    A.    Mr. Chon's Childhood and Immigration to the United States .................. 3

    B.    Mr. Chon's Career as a Construction Engineer ............................... 3

    C.    Mr. Chon's Development of Chon Engineering ................................. 4

    D.    Mr. Chon's Development of Spa Castle and Related Businesses ................ 5

III.  MR. CHON'S DEDICATION TO HIS FAMILY AND COMMUNITY ..................... 7

    A.    Dedication to his Family .................................................... 7

        1.    Mr. Chon's Immediate Family ........................................... 7

        2.    Mr. Chon's Extended Family ............................................ 10

    B.    Mr. Chon's Dedication to Others ............................................ 11

        1.    Generosity to His Community ........................................... 11

        2.    Generosity to and Support of Spa Castle Employees .................... 11

    C.    Pleas for Lenience ......................................................... 14

        1.    Family Members' Pleas for Compassion ................................. 14

        2.    Community Members' Pleas ............................................. 15

        3.    Employees' Pleas for Mercy ........................................... 15

**III. MORE THAN 280 EMPLOYEES MAY LOSE THEIR LIVELIHOODS IF MR. CHON IS NOT PRESENT TO LEAD AND DIRECT THE SPA CASTLE BUSINESSES** 16

    **A. Applicable Legal Principles** ......................................................................... 16

    **B. The Court Should Allow Mr. Chon to Remain in His Indispensable Role at Spa Castle** 18

**IV. THE SENTENCING FACTORS MILITATE IN FAVOR OF A NON-CUSTODIAL SENTENCE** ...................................................................................................... 21

    **A. Applicable Legal Standards** ......................................................................... 21

    **B. The Advisory Guidelines Calculation** ........................................................ 22

    **C. The Sentencing Factors Support a Non-Custodial Sentence** .................... 22

**V. CONCLUSION** ................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Gall vs. United States*, 522 U.S. 38 (2007)............................................................ 21, 26

*Rita v. United States*, 551 U.S. 338 (2007) ..................................................................... 23

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) ................................................ 23

*United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994)................................................. 17

*United States v. Hinderhofer*, No. Cr. 13-0262 (E.D.N.Y.  Jan. 17, 2014) ................... 18

*United States v. Khalid*, No. 09–CR–734, 2011 WL 6967993 (E.D.N.Y. Dec. 13, 2011).......... 17

*United States v. McCarthy*, No. 1:22-cr-00491, 2023 WL 3741996

(E.D.N.Y. May 30, 2023) ........................................................................................ 25, 26

*United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995) ............................................. 16, 17

*United States v. Retizenstein*, No. 15-CR-0643, 2016 WL 1745672 (E.D.N.Y May 2, 2016)25, 26

*United States v. Rodriguez*, 697 Fed App'x 734 (2d Cir. June 21, 2017).................... 21

*United States v. Somerstein*, 20 F. Supp.2d 454 (E.D.N.Y. 1998) ............................... 18

*United States v. Toback*, No. 01 CR. 410(RWS), 2005 WL 992004 (S.D.N.Y. April 14, 2005). 18

## STATUTES

18 U.S. Code § 3553(a), (b).................................................................... 1, 21, 22, 26

26 U.S. Code § 7202 ................................................................................... 21, 22

United States Sentencing Guidelines § 2R1.1 ............................................................. 17

United States Sentencing Guidelines § 5C1.1 ............................................................... 1

United States Sentencing Guidelines § 4C1.1 ................................................. 22, 24, 26

United States Sentencing Guidelines § 5C1.1 ............................................................. 27

**OTHER AUTHORITIES**

Terry Carter, *The Judge Who Said No*, ABA Journal, Oct. 2013 ................................................. 21

Steve Chon is a fundamentally good person who made a misguided decision related to payroll taxes associated with his business. Mr. Chon recognizes the seriousness of his conduct, and he has thoroughly accepted responsibility for his actions. He plead guilty to an information and he has already made full restitution to the Internal Revenue Service (the "IRS"). We respectfully submit that there is absolutely no societal benefit to sentencing Mr. Chon, a 64-year-old, hard-working family man who is irreplaceable at his company (which employs over 280 hard-working individuals) to any term of imprisonment. Rather, we respectfully submit that a probationary sentence will be more than sufficient to satisfy the goals of sentencing as set forth in 18 U.S.C. § 3553(a). Indeed, the U.S. Sentencing Commission has recently advised sentencing courts that "a sentence other than a sentence of imprisonment . . . is generally appropriate" in cases such as this one. United States Sentencing Guidelines (USSG) § 5C1.1 (Application Note 10(A) (adopted, to become effective Nov. 1, 2023)).

We have supplemented this submission with numerous letters to the Court in support of Mr. Chon. The voices of Mr. Chon's family members, community leaders, and employees strike many notes in a powerful chorus of alarm over the prospect that this otherwise-admirable man will potentially be absent from their lives, and from their community. We join in their requests for the Court's mercy and attempt through this memorandum to convey adequately to Your Honor the essential generosity, kindness, and humility of the man who will stand before the Court for sentencing.

## I.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Chon created the Spa Castle company.[1]  Spa Castle is a Korean-style family spa facility that offers its customers hydrotherapy pools, saunas, spa treatments, as well as dining and entertainment.  As discussed in more detail below, Spa Castle began in College Point, Queens, but has expanded to several other U.S. locations.  The basic problem that led to this case can be traced to Spa Castle's rapid growth from a "mom and pop" start-up operation with a single spa, to a large business with various locations in several states, multiple revenue streams, and nearly 300 employees.  Along the way, Mr. Chon (who has no accounting background nor any experience with corporate finance matters) delegated the Spa Castle payroll and accounting functions to others but failed to ensure that the company's payroll tax returns were thoroughly accurate and that the correct amount of federal payroll taxes were withheld from employees' wages and remitted to the IRS.  As Mr. Chon acknowledged at his plea hearing, he was aware that some Spa Castle managers had paid some employees in cash and that it was likely that the company's payroll taxes were not correct.[2]  Although Mr. Chon ultimately addressed these problems by eliminating the cash payroll and moving his companies to third-party payroll processors prior to the outset of the investigation leading to this case, the company's payroll taxes from the first quarter of 2014 through the first quarter of 2016 were not adequately reported.  As a result, despite Mr. Chon's efforts to normalize payroll practices, Spa Castle did

---

[1] Spa Castle is now part of C-Castle Group Corp. (sometimes collectively "Spa Castle" or "Spa Castle businesses), a holding company comprised of several related businesses.  (*See* Presentence Investigation Report (PSR) ¶ 47.)
[2] The PSR incorrectly suggests that Mr. Chon knowingly hired undocumented workers and that doing so would provide a basis for an upward departure under the Guidelines.  (*See* PSR ¶¶ 6, 73.) It is not clear what this erroneous theory is based on.  Mr. Chon was not directly involved in the hiring of employees for non-management positions and we are not aware of any evidence that he intentionally hired undocumented workers.

not withhold sufficient payroll taxes from some of its employees and therefore did not remit the correct amount of payroll tax to the IRS when it was due.

## II.    PERSONAL HISTORY

### A.  Mr. Chon's Childhood and Immigration to the United States

Steve Chon personifies the classic American immigrant success story.  His wife, Judy, agrees: "*We started out with just love and almost no money but Steve worked so hard to chase the American Dream and provide for the family.*" (Judy Chon Letter, Exh. E.)

Mr. Chon was born in South Korea, where he spent his childhood with his parents (James and Hae Ja) and two siblings (Daniel and Victor), all of whom he remains close with.  Mr. Chon grew up in Seoul, where he attended school through his junior year in college.  His family relocated to the United States in 1980 and Mr. Chon continued his education as a transfer student at NYU Tandon School of Engineering, from which he graduated in 1984 with a degree in mechanical engineering.  Mr. Chon decided to make his life in the United States because he saw a better chance to "make it" through all the opportunities this country offered him.  His assimilation was aided by the fact that his father had worked in Korea as a fire chief on a U.S. Army base where he learned some English and was exposed to American culture, both of which made a positive impression on Steve as he was growing up.  Mr. Chon and his family first lived in the Bronx and thereafter moved to Long Island, where he, his parents, and his brothers reside near each other's homes to this day.  Mr. Chon proudly became a naturalized citizen in 1985.

### B.  Mr. Chon's Career as a Construction Engineer

Mr. Chon began his engineering career in 1985, working for the U.S. Department of Defense.  He started as a systems engineer but, by 1993, had been promoted several times and had become a project manager.  Mr. Chon was part of a technical support group that designed

and built a $2 billion expansion project at the Fort Drum U.S. Army base in Watertown, New York, currently home to the Army's Tenth Mountain Division.  According to Mr. Chon's supervisor, "*[t]hanks to Steve's dedication and hard work, the construction was completed smoothly, on time, **and** within budget*. (Wing Chan Ltr., Exh. A. (emphasis in original).)  Fort Drum's new infrastructure was used by soldiers returning home from deployments to the first Gulf War. The military recognized Mr. Chon's ingenuity and unfaltering work ethic and awarded him the Excellent Performance civilian award for his service.

### C.  Mr. Chon's Development of Chon Engineering

Mr. Chon and his wife Judy have three daughters: Jennifer, Stephanie, and Jessica.  Mr. Chon struggled financially when his daughters were born as his government salary was not enough to pay all of the bills that came along with his growing family.  At first, to make ends meet, Mr. Chon held three jobs simultaneously.  He worked for the Defense Department during the day, as a clerk at a stationary shop in Queens in the evenings, and as a salesperson at a sneaker store in the Bronx on weekends.  Then, in 1994, Mr. Chon took a big risk by going into business for himself, borrowing funds from whoever would lend them, and establishing his own company, Chon Engineering, P.C., an architecture and engineering firm located in Queens.

Judy Chon explains in the PSR that, while Mr. Chon has always been a dedicated family man, he is also a "workaholic who has always devoted himself to his business."  (PSR ¶ 39.)  At first, Judy was his only employee. Mr. Chon's oldest daughter, Jennifer Chon, describes:

> *Thoughts of how he could be an even better provider pushed [my father] to start his own engineering firm. He borrowed funds from friends and family to rent a small office space and started his firm with my mother as his secretary. I remember my mother working in the dark in order to save on electricity while my father was out of the office reaching out to whoever would hear him out trying to drum up business. Although it was a slow start, my father's business grew exponentially. My father's business grew through word of mouth and because he went above and beyond for his clients.*

(Jessica Chon Ltr. Exh. D; see also Kenneth Cooke Ltr., Exh. H.)

Judy Chon confirms just how hard Steve worked to get his business off the ground and known in his community: "*Steve was always diligent and worked late into the night or even all night. All this hard work meant Steve had a good knowledge of about many issues facing many businesses owned by the Korean community*." (Judy Chon Ltr. Exh. E.)

Chon Engineering operated mostly in the Korean American communities in Queens and Long Island, where Mr. Chon became known for his incredible work ethic, his superb highly skilled craftmanship, and his technical expertise. "*After some time, my father's business grew and he became solely responsible for building up almost all of the new properties in Flushing and Koreatown.*" (Jennifer Chon Ltr., Exh. C.)  A former client attests that, when he hired Chon Engineering to develop and construct a "very complicated" building project, "*Mr. Chon's professionalism and commitment to excellence showed through the entire two years project*." The client hired Mr. Chon for later projects. (Vincent Randazzo Ltr., Exh. S.)

Notably, Mr. Chon held a New York professional engineer license, was recognized as the first Korean American master plumber in New York and was also qualified as a Type A fire suppression professional.  To this day, it appears that Mr. Chon is the only individual in New York State to have held all three accreditations simultaneously.

### D.  Mr. Chon's Development of Spa Castle and Related Businesses

During his trips back to Korea and travels to Japan, Mr. Chon observed how Western businesspeople were drawn to Asian bathing culture and the spa facilities found in many hotels and resorts.  Mr. Chon decided to try the concept in the United States, something he was well positioned to do considering his experience as a talented mechanical engineer and master plumber.  In 2005, he began construction of the first Spa Castle facility in College Point, Queens.

Mr. Chon designed and built the facility from the ground up—often fitting pipes and erecting sheet rock himself.

Spa Castle opened to the public in 2007.  It offers guests (mostly families enjoying day passes) various pools/bathing areas, saunas, spa treatments, rest areas and dining options—a complete Korean-style spa experience under one roof in Queens.  Mr. Chon's work and devotion to Spa Castle is evident to anyone who visits the facility and M has been lauded by the New York Times, Asian Forbes Magazine, and Inc. Magazine, among many others.  A journalist writing for the Arts section of the New York Times once described the Spa Castle experience:

> A trip to Spa Castle in College Point, Queens, almost feels like leaving Earth. Spa Castle is a 100,000-square-foot temple of bathing that boasts indoor and outdoor pools, seven coed saunas and two food courts offering corn dogs, udon noodles and much more.
>
>     \*     \*     \*
>
> The enormous second floor has a food court on one side and seven saunas on the other. The saunas are all housed in tiled igloo-shaped structures, each offering something different. There is an LED sauna where bathers can choose a color intended to convey a different restorative property (i.e., yellow promotes creativity). There is a traditional Korean sauna with wood-beamed ceilings and mats on the floor. There is even an ice sauna, which is kept around 37 degrees and has walls covered in thick frost.
>
> Two flights up are the bade pools, two huge bubbling and foamy outdoor pools with numerous jets and built-in tile seats with individual whirlpool controls. The water is warm, and the whole thing is lighted beautifully at night, with the Whitestone Bridge twinkling in the distance.[3]

Mr. Chon is proud of Spa Castle—the first spa of its kind in America—and the countless hours of toil and dedication that he put into creating his vision.  The stain of his conviction is

---

[3] New York Times, "New York Spas that Offer Healing Relief" (Apr. 19, 2012) available at: https://www.nytimes.com/2012/04/20/arts/new-york-spas-that-offer-healing-relief.html (last accessed Oct. 6, 2023).

particularly painful because it associates Mr. Chon with criminal conduct even thorough he spent his life working to create something special

Mr. Chon's strong work ethic did not allow him to retire once Spa Castle Queens became successful. Instead, he expanded the Korean spa concept to Spa Castle locations in Manhattan, Texas, and, most recently, Virginia. Although the Manhattan location closed during the pandemic, the remaining locations continue to operate, offering a one-of-a-kind, family-friendly spa experience that employs over 200 employees. Mr. Chon has established other successful businesses as well. An example is the One Boutique Hotel in Flushing, survived the financial stress of the pandemic and continues to welcome guests while employing around 22 employees.

Mr. Chon has received numerous awards over the years for his work and entrepreneurship, including the Ellis Island Medal of Honor in 2011. The Medal of Honor is awarded annually and recognizes "the importance of immigration to America's prosperity and celebrates the contributions immigrants and their progeny have made to our nation." Medal recipients have made significant contributions to the United States by demonstrating "an outstanding commitment to serving our nation either professionally, culturally or civically, among other criteria."[4]

## III.   MR. CHON'S DEDICATION TO HIS FAMILY AND COMMUNITY

### A.  Dedication to his Family

#### 1.  Mr. Chon's Immediate Family

Mr. Chon's wife, Judy, describes her life with Steve since they married in 1985, when she was 22, and Steve was just out of college. Steve was determined to marry Judy, the love of his life, even though his mother was so much against the marriage that she, in Judy's words,

---

[4] Ellis Island Honors Society, available at: https://www.eihonors.org/about (last accessed Oct. 6, 2023).

"*went on a hunger strike and only stopped when she saw that Steve would marry me no matter what.*" Judy became pregnant soon after. She describes: "*We lived, in love, in a small apartment with no real kitchen.*" (Judy Chon Ltr. Exh. E.) Judy worked in a photo shop and Steve worked in a shoe store at the same time as he tried to attend graduate school in engineering at Rensselaer Polytechnic but was forced to drop out. "*Because we had no money, Steve dropped out of graduate school and worked full time as a clothing salesman in Chinatown.*" (Judy Chon Ltr. Exh. E.)

The couple's fortunes changed when, although Steve had not finished graduate school, he "*applied for a job listed in the New York Times by the Army Corps of Engineering*" (Judy Chon, Ltr., Exh. E), and began his engineering career, then opened Chon Construction, and later Spa Castle, as described above.

Judy writes that "*Steve has always worked hard and has provided well for his family. We are fed and clothed and have a nice house and a good life*" (Judy Chon, Ltr., Exh. E.) Judy is happy in her marriage where her preference for being a homebody complements Steve's hard work outside the home.  She is "*always happy when housework is done and my family is fed*" (Judy Chon, Ltr., Exh. E.)

The couple's oldest daughter, Jennifer, describes how, although Steve's incredibly hard work to better the family meant he might not have been as present as other fathers:

> *As tired as he may have been, he made time for his kids ... My dad would take us on his business trips when he was working for the government so we have [video] footage of us stopping in Maine to eat lobsters, taking the ferry to Niagara Falls, splashing around in the hotel pools. On the weekends, he would take us to the playground and film us on swing[s], buy us Italian ices, and encourage singing my made up songs. ...  My father has taken so much energy to do the right thing, give my family a good life, and set the right examples for my sister and I.*

(Jennifer Chon Ltr., Exh. C.)

The letter from Jessica Chon, the couple's youngest daughter, is a heartfelt, honest description of her relationship with her father. "*When I was growing up, my father was nearly always working to provide for me, my sisters, and mother. As I've gotten older, I've only grown to appreciate his efforts for our family and have understood more how he had to sacrifice his time in order to give us not only a more comfortable life, but also opportunities he never had and wanted us to experience.*" (Jessica Chon Ltr., Exh. D.)

Jessica realizes, looking back, that "*there were many instances of him trying to express his love for us*." She describes a particularly poignant moment when her father gave her a telescope for her 12th birthday. "*At the time I was confused by the random gift and asked my sister why our dad bought me a telescope. She told me he wanted to help me see the stars since I was so interested in looking at them.*" Her father didn't know she'd had "*a school assignment to observe and document constellations for a month,*" but he did know she was "*outside staring at the sky each night.*" She describes how this gift still affects her: "*Now, every time I walk past the telescope, I am reminded that my father cares deeply for his family and is watching over us in his own way, even if it's not always obvious to us.*" (Jessica Chon Ltr., Exh. D.)

Stephanie Chon, the Chons' middle daughter, confirms that her father is committed to his family. She attaches a letter he wrote when she was a young child, which is today one of her most prized possessions: "*It shows the love of a struggling father, who needed to sacrifice time with the family to provide for the family, all the while navigating cultural/financial/language barriers. This was his American Dream and building a business was his way to support all those around him.*" The handwritten letter, on lined school paper, is heartbreaking in its simple declaration of love:

*My lovely daughter, Stephanie:*

*Even if I don't see you everyday*
*or night, even if I don't spend*
*much time with you,*
*my heart is always with you.*
*I think about you in school,*
*you in future, you in youth, etc.*

*I love you Stephanie.*

*I love all of you.*

*Daddy*

*Did you see me waving hands in this morning when you got on the bus?*

(Stephanie Chon Ltr. Exh. F, and attachment)

Mr. Chon's daughters describe how their family has become closer during the stress of this case. "*I've noticed in recent weeks a change in my father's behavior, where he's now being **even more** supportive of my sisters, mom, and me.*" (Jessica Chon Ltr., Exh. D (emphasis added).) "*We have all become so much closer and dread having him again absent from our lives.*" (Stephanie Chon Ltr., Exh. F.)

### 2. Mr. Chon's Extended Family

As the oldest of three sons in a traditional Korean family, Mr. Chon is expected to support his family. He accepts this role with his whole heart. "*Steve takes his duty as the oldest son very very seriously [and] says, 'Whatever you have, you share.'*" (Judy Chon Ltr, Exh. E.) When his two brothers' businesses foundered, Steve took them into his own business, helped them buy homes, and even now "*supports them both so that their [new] businesses will be profitable.*" (Judy Chon Ltr. Exh, E.)

Mr. Chon completely supports his parents financially. Recently, his father was a victim of the tragedy caused by eyedrops manufactured in India that were contaminated with drug resistant bacteria. He lost an eye and can barely see out of the eye he has left. He is currently in

a long-term care facility and relies heavily on Mr. Chon, who oversees and coordinates his father's medical care and otherwise takes care of him. "*All of the care of Steve's father falls on me and Steve because the oldest son is responsible.*" (Judy Chon Ltr., Exh. E.)

## B. Mr. Chon's Dedication to Others

### 1. Generosity to His Community

Steve Chon's extraordinary generosity to others in the Korean community and to his employees is innate:

> *Steve has always wanted to help other people outside the family. Steve often says, "We are not special. .... So we shouldn't feel we are better than others." He believes our family is lucky, and that we have a good life not because we are special. After he made money, Steve has helped so many people.*

(Judy Chon Ltr., Exh. E.) Steve's generosity extends to people Judy thinks have taken advantage of him: "*Although several employees left and opened their own businesses to compete with Steve, . . . Steve had no bad-feeling and wished them well. Honestly, I felt bitter but Steve was generous, saying, 'They have a right to make money.'*" (Judy Chon Ltr., Exh. E.)

Steve has felt it his duty to help Korean immigrants who, as he once did, are trying to carve out lives for themselves and their families in America. A former employee of Chon Engineering and now close friend of Steve's describes how: "*One day he said to me, 'This small deli project cost me about 2 thousand dollars but for the owner of this project, this would be his first dream-come true project in his American life.'*" (Yongseok Choi Ltr., Exh. B.)

A leader in the Korean community sums up how: "*Throughout the years, Steve has supported many causes and efforts to assist the next generation of Korean-America leaders by donating his money and his time.*" (San SangKi Han Ltr., Exh I.)

### 2. Generosity to and Support of Spa Castle Employees

Former and current employees testify to Mr. Chon's true generosity of spirit and careful attention to his employees' wellbeing and potential. When Chon Engineering was first starting out and struggled financially, Steve ensured that his employees were paid, even if it meant he went without. "*Mr. Chon always made sure I was paid even though he used to not get his own paycheck since the company was very small*." (Yonseok Choi Ltr., Exh. B.)

Mr. Chon's magnanimity continued as his businesses expanded. The manager of Spa Castle's Dallas facility grew into that position because Mr. Chon recognized potential in an entry-level juice bar staff member and promoted him first to locker room attendant and valet parking team leader, then to purchasing manager, and then to his current position. "*[T]hanks to the support and guidance from Mr. Chon, I transformed from someone unfamiliar with the spa industry into an experienced professional*." When he married and had a child, Mr. Chon "*generously also increased my salary to support my household*." (Jude Hwang Ltr., Exh. J.)

Another employee describes how Mr. Chon helped him grapple with "imposter syndrome" when he first joined the Spa Castle organization, and made sure that he grew into his potential:

> *During those initial stages, I recall Steve taking it upon himself to regularly check in on my progress and reassure me that he saw something in me. His unwavering support and encouragement helped me overcome my self-doubts and grow into my role with newfound confidence. Over the years, Steve continuously provided me with opportunities to explore new fields and take on responsibilities that were beyond my immediate expertise. ... Each step of the way, he took a chance on me, and whenever I rose to the occasion, he rewarded me with even more opportunities for growth.*
>
> *This personal journey I experienced under Steve's mentorship is not unique; it echoes his approach towards all his employees. Steve has a remarkable ability to identify potential in individuals, often those overlooked by traditional standards.*

(Joshua Lee Ltr., Exh. N.)

The manager of Spa Castle's Texas facility describes both Mr. Chon's attention to himself personally and dedication to all his employees:

> Steve Chon ... has not only inspired me but also many other employees at the company. Through many meetings, he has mentored and shown me the direction to achieve the American Dream in my otherwise ordinary life. He emphasized the importance of people over money in many aspects such as leadership, ethics, initiative, and professionalism, providing valuable advice. He constantly encouraged us to apply ourselves to be better and be positive to society. He did this not just by words, but he showed us by his actions. Although he is the CEO, he considers each employee as family and has always been helpful in their development, not only as a successful employee but in their personal lives.

(Daehee Jo Ltr., Exh. K.)

On a more deeply personal level, an employee of the first Spa Castle since it opened describes Steve's extraordinary compassion when she was too depressed to go to work.

> In the earlier days of my employment, my father passed away back in Korea due to cancer. As a mother of two young kids, as overwhelming as it was ... I spiraled deeper into my anguish, I received an unexpected call from Steve. With his comforting condolences, he reassured me that the company would welcome me with open arms when I was ready to return. The empathy and warmth he bestowed was unforgettable, especially considering that I was only one employee out of nearly two-hundred. ... As I reflect on his kindness even now, I cannot imagine that anyone else would be able to do the same.

(Jungmi Chun, Exh. G.)

Mr. Chon has shown the same big-hearted, sympathetic generosity to all his employees. "*In 2017, my mother was very sick and I needed to go to Korea[,] Mr. Chon bought my plane ticket and gave me time off so I could visit my mother.*" (Hyuk Lee Ltr., Exh. M.) "*There was a worker who had a stroke, not on the job site, but while he was working for my father. My father would take the time to visit him in the hospital and helped cover this man's expenses.*" (Jennifer Chon Ltr., Exh. C.) "*[T]he General Manager of the New York branch recently lost his father. Upon hearing this, Steve Chon provided assistance both from a company perspective and personally.*" (Daehee Jo Ltr., Exh. K.)

Steve's brother-in-law, who calls Steve his Hyoungnim, or older brother in Korean, describes how Steve has always tried to improve others' lives, including his employees':

> *While he was climbing the ladder of success, he not only ascended himself but also always looked out for others, making sure that he brought many hard workers along with him including his brothers, friends, employees, and contractors. Many of these people have continued to work with him for many years, or even decades, which is unusual in these modern times of job-hopping, because of his loyalty, generosity, and support. After all that is said and done, in a word, my Hyoungnim is a "mensh."*

(Kenneth Cooke Ltr., Exh. H.)

### C. Pleas for Lenience

Those who have written to the Court express heartfelt pleas for Your Honor to be lenient, stressing that Mr. Chon's presence is vital to his family, his community, and his employees:

#### 1. **Family Members' Pleas for Compassion**

Judy Chon writes: "*If you send Steve to prison, we will suffer. His father will suffer. His employees will suffer because many will lose their jobs. Please don't send my husband to jail.*" (Judy Chon Ltr. Exh. E.) Jessica Chon acknowledges her father's wrongdoing but writes: "*I cannot envision my dad not being with us. He's the one who oversees our company and supports our family, and sending him to prison would really devastate many people's lives who depend on him. Thus, I just humbly ask that you view this situation with fairness and a consideration of the kind of man my father is as a whole.*" (Jessica Chon Ltr., Exh. D.) Stephanie Chon asks the court to "*give him a chance as he has always done to others.*" (Stephanie Chon Ltr., Exh. F.) Jennifer Chon writes: "*Your Honor please show my father compassion. His heart is truly well-meaning and it is unfortunate that his amazing qualities and trust contributed to why he has had such a negative turn of events.*" (Jennifer Chon Ltr., Exh. C.)

Mr. Chon's brother-in-law writes: "*I am just hoping and praying that his punishment is imbued with a large degree of mercy. ... I know Hyoungnim now understands that he ended up doing wrong. I know he will never do anything like this again. I am sure that, if Your Honor gives him the chance, Mr. Steve Chon will be much more of a positive asset to the United States, his community, employees, and family, as he has already been in the past, than if he is sent to prison where he can help no-one.* (Kenneth Cooke Ltr., Exh. H.)

## 2. <u>Community Members' Pleas</u>

*Your Honor, as someone who has dedicated my life to law enforcement and supporting our local community, I ask that you understand the good that Mr. Chon does, and take into consideration that it would be a terrible waste and loss to the community if he is incarcerated where he can do no good to anyone.* (Kevin O'Donnell, Retired from NYC Police Dep't, Ltr. Exh. R.)

*I hope that your honor will consider Steve outside of what he has been accused of doing or found guilty of. .... He is a very good man, always willing to help people around him, and tries to pay back to the community at every opportunity. He is someone who has made a difference in the community and many lives and is someone that many people in our community depend on.* (Jong Hwan No, business owner, Ltr. Exh. Q.)

*Having witnessed him for a long time and as a business owner in the community, I guarantee the Mr. Chon being present is a really important asset to Flushing, Queens, and the United States of America. ... His passion with honesty has been developed and devoted to the business of NY, and I hope he can continue to do so as he did before. Please let him get back to normal life with minimal punishment.* (Yonseok Choi, President, Choi Design, Flushing, Ltr., Exh. B.)

## 3. <u>Employees' Pleas for Mercy</u>

*I sincerely and respectfully ask that you graciously give thought to the countless number of people who are guarded under his wing when reaching your decision.* (Jungmi Chun Ltr., Exh. G.)

*I urge Your Honor to consider the real-life examples of Steve's compassionate actions and the dire consequences of losing his guidance when making your sentencing decision.* (Joshua Lee Ltr., Exh N.)

*I ... understand that the court's role is to balance justice with mercy. I urge you, Your Honor, to consider Steve Chon's history and contributions when making*

*your decision. I believe a favorable judgment will extend beyond Steve Chon to his family, friends, and the company at large.* (Daehee Jo Ltr., Exh. K.)

\*\*\*

As his history and characteristics make clear, despite his humble beginnings, Mr. Chon has led a hardworking and honorable life. Through his tireless dedication, he has operated a successful business for many years and has been a beloved employer to numerous employees, many of whom have stayed with him for many years. He has been a dedicated husband and father. He has also been a treasured member of his community. For all of these reasons, we respectfully submit that Mr. Chon's personal history and unique characteristics demonstrate that he is fundamentally a good person and is deserving of this Court's leniency in this case.

## III.  MORE THAN 280 EMPLOYEES MAY LOSE THEIR LIVELIHOODS IF MR. CHON IS NOT PRESENT TO LEAD AND DIRECT THE SPA CASTLE BUSINESSES

We respectfully submit that the factual evidence outlined below demonstrates that, if Mr. Chon is incarcerated, the Spa Castle business will disintegrate, leaving the business's over 280 employees, not to mention all these individuals' many dependents, without jobs or support and that this evidence weighs in favor of a probationary sentence.

### A.  <u>Applicable Legal Principles</u>

It has long been established in this Circuit that, if a defendant's incarceration will cause employees of the defendant's business to lose their livelihoods, a downward departure from the Guidelines range is appropriate. *United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995). After *Booker*, this Court has even greater leeway to vary from the Guidelines to protect the livelihoods of Spa Castle's employees and their ability to provide for their families.

The defendant in *Milikowsky* was convicted of price-fixing in violation of the Sherman Act, a crime for which the USSG *specifically recommends a prison sentence* as deterrence. 65

F.3d at 6-7 (citing U.S.S.G. § 2R1.1, cmt., and *United States v. Haversat*, 22 F.3d 790, 797-98 (8th Cir. 1994) ("confinement should be imposed in 'all but the rarest' criminal antitrust cases")). The Second Circuit nevertheless upheld a downward departure from a Guidelines range of 8 to 14 months' imprisonment to six months' home confinement and two years' probation for a defendant who, similarly to Mr. Chon, was "the only individual with the knowledge, skill, experience, and relationships" to keep two businesses alive. *Milikowsky*, 65 F.2d at 6, 8.[5] Moreover, as here, the businesses' dependence on the defendant was "greatly increased by the companies' extremely precarious financial condition." *Id*. at *8. (*See* Rocco A. Cavaliere Ltr., Exh. W.) The Second Circuit counseled that "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" *Id*. at 9 (citation omitted).

Other cases, both pre- and post-*Booker*, have applied this compassion and common sense to decide against imprisoning a defendant, even when the Guidelines range was much higher than here, and fewer employees' livelihoods were at stake.[6] Courts continue to apply the *Milikowsky* factors in unreported sentencing decisions.

---

[5] The district court distinguished the defendant in *Milikowsky* from "high level business people," *id*. at 8 but Mr. Chon's intimate hands-on approach to and knowledge of the Spa Castle businesses makes him analogous to a small business owner.

[6] *See United States v. Khalid*, No. 09–CR–734, 2011 WL 6967993, at **1-2 (E.D.N.Y. Dec. 13, 2011) (departing from 30 to 37 months' imprisonment to five years' probation, because*, inter alia*, the defendant owned several businesses and employed over a dozen people); *United States v. Hinderhofer*, No. Cr. 13-0262 (E.D.N.Y. Jan. 17, 2014), Transcript of Sentencing Hearing, Exh. V, at p.19 (departing from 24 to 30 months to six months home detention, four years' probation, and community service because eight employees would lose their jobs); *United States v. Somerstein*, 20 F. Supp.2d 454, 460-61 (E.D.N.Y. 1998) (departing from Guidelines range of 12 to 18 months to six months home detention because, without defendants' daily presence, "the business will fail");*United States v. Toback*, No. 01 CR. 410(RWS), 2005 WL 992004, at **5-6 (S.D.N.Y. April 14, 2005) (departing downward from 10 to 16 months to home detention and probation for a drug dealer because, if he was imprisoned "a vacuum in leadership would result, significantly threatening the business's continued prosperity and endangering the future employment of its 80 plus employees").

**B. The Court Should Allow Mr. Chon to Remain in His Indispensable Role at Spa Castle**

Factual evidence demonstrates that Mr. Chon plays an essential role in the Spa Castle businesses and that his absence will have a deleterious affect on the businesses and their employees. The law firm Tarter, Krinsky & Drogin LLP was engaged to review and analyze the business operations, loan arrangements, and employee structure of the Spa Castle businesses, together with Mr. Chon's role in such matters. Rocco A. Cavaliere, a partner of the firm and corporate restructuring and bankruptcy expert, produced a letter summarizing the firm's findings for inclusion as an exhibit to this sentencing submission. (*See* Rocco A. Cavaliere, Esq. Ltr., Exh. W.) Mr. Cavaliere highlights Mr. Chon's significant responsibilities, his unique contributions as both a businessman and as an engineer/plumber, and the fact that he has personally guaranteed loans and lines of credit that are critical to the Spa Castle businesses' (referred to by Mr. Cavaliere as the "Chon Entities") ability to function and stay in business. (*See* Rocco A. Cavaliere, Esq. Ltr., Exh. W at 6-8.) Mr. Cavaliere also describes how nearly 300 hard-working employees, many of whom have been with the Spa Castle businesses for many years, rely on their positions with the companies for their paychecks, their own and their families' health insurance coverage, and other benefits. (*See* Rocco A. Cavaliere, Esq. Ltr., Exh. W at 9.) As Mr. Cavaliere succinctly concludes: "Mr. Chon plays an irreplaceable role in so many areas of the Chon Entities' business that his absence will result in many employees losing their jobs with the companies." (*See* Rocco A. Cavaliere, Esq. Ltr., Exh. W at 9.)

Spa Castle employees, including Mr. Chon's daughters, who all work at Spa Castle, implore the Court not to imprison Mr. Chon for the sake of the business and its more than 280 employees. Mr. Chon's knowledge of the whole Spa Castle operation in different states, his personal relationships with vendors and banks, and even his technical expertise, are

irreplaceable.  His intimate involvement in every detailed aspect of the overall business makes it impossible to simply hire a new CEO to replace him.

The manager of Spa Castle in Texas describes Mr. Chon's irreplaceable technical skills:

> *Steve Chon, with his engineering and operational expertise in the spa industry, is the person responsible for making Spa Castle possible in the United States. ...* ***[I]f Steve Chon were to leave the company, I believe it would be almost impossible to operate the company****. ... Specifically, facilities such as spa pools, traditional Korean saunas, and hydro jets have been designed and mechanically equipped using Steve Chon's expertise. If there are issues in this regard, the competence of Spa Castle facility staff can address them to some extent, but **fundamental problem-solving can only be accomplished by Steve Chon***.

(Daehee Jo Ltr., Exh. K (emphases added.) Mr. Chon's immediate subordinate believes that "*hundreds of employees, myself included, who have relied on his steady hand, professional and personal advice, and compassionate leadership, would face uncertain times without his presence*." (Joshua Lee Ltr., Exh. N.)

The facility manager at Spa Castle in Texas believes: "*CEO Steve Chon is a necessary and crucial figure for our employees. If a vacancy were to emerge due to his absence, I believe many people who have grown and evolved alongside him could face major challenges. All of his forward-looking business plans, including the very existence of his company, are indispensable for the employees, their families, and their well-being.*" (Jude Hwang Ltr., Exh. J.)

Stephanie Chon, who was promoted to COO during Spa Castle's restructuring and contraction from 500 to less than 300 employees during and after the COVID pandemic, writes that, despite her title, she is terrified of what will happen if he is imprisoned:

> *[My] sickening worry is how I can work to survive the businesses without my father's continuous help. ... We are still financially recovering from our losses [from the pandemic] and, with our opening a new business, **I really don't know how the businesses will survive if my father is no longer present to oversee his whole business enterprise.** I am terrified that I cannot handle all this, in large part because many of the businessmen that we in turn rely on trust only my father.*

> ***I now can truly understand my father's stress when 300 people's livelihood is
> on the line****.*

(Stephanie Chon Ltr., Exh. F (emphases added).) Stephanie asks the Court to "*impose a
sentence that allows my father to continue to work with all of us and to support all these
employees and their families*."

Jessica Chon began working at Spa Castle when she graduated from college in 2020.  She
believes that banks' and vendors' trust in her father as an individual have carried the business
through the fallout of the pandemic:

> *I constantly worry about what will happen to my family and our business if my
> father is in prison. Anyone who knows my father understands that he truly is the
> only one with the skillsets, knowledge, and/or power to get things done. ... **To be
> frank, if it weren't for my father's long-standing relationship with our banks
> and vendors, our business wouldn't have survived this long***. *Banks and vendors
> are drastically more lenient and cooperative with us when working with my father
> since his track record shows him to carry out his obligations and address any
> concerns promptly and thoroughly.*

(Jessica Chon Ltr., Exh. D (emphasis added).) Jessica concludes: "*He's the one who oversees our
company and supports our family, and sending him to prison would really devastate many
people's lives who depend on him.*" (Jessica Chon Ltr., Exh. D.)

Jennifer Chon, who joined Spa Castle last year, also describes her father's irreplaceable
role in every aspect of Spa Castle's operations, confirms that Spa Castle can't simply hire a new
CEO to replace her father, and asks the Court not to imprison him, because, "*There is no one
who can replace my father. There's no one we can hire who can know every part of the whole
business like my father and also deal with vendors who rely on my father. Please let my father
continue to support the families of his hundreds of employees and continue with his other good
works*." (Jennifer Chon Ltr., Exh. C.)

# IV. THE SENTENCING FACTORS MILITATE IN FAVOR OF A NON-CUSTODIAL SENTENCE

## A. Applicable Legal Standards

While the now familiar standards of 18 U.S.C. § 3553(a) should inform the sentence here, the Court "need not . . . utter robotic incantations repeating each factor that motivates a sentence, … or precisely identify the § 3553(a) factors or address specific arguments bearing on their application." *United States v. Rodriguez*, 697 Fed App'x 734, 738 (2d Cir. June 21, 2017) (Summ. Op.) (cleaned up and citations omitted.)  And, while the Sentencing Guidelines provide a "starting point," the Court should not presume "that the Guidelines range is reasonable";  need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range"; and should instead impose a sentence after "mak[ing] an individualized assessment based on the facts presented" in this case, *Gall vs. United States*, 522 U.S. 38, 47, 49-50 (2007).

As another federal judge once explained, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[7]  The Supreme Court's and the Second Circuit's post-*Booker* decisions significantly broadened the discretion of this Court to impose a less stringent sentence than the one suggested by the advisory Guidelines—which themselves now counsel that the Court consider fashioning a sentence that does not include incarceration in cases such as this.  We respectfully submit that a probationary sentence is warranted in this case.

---

[7] Terry Carter, *The Judge Who Said No*, ABA Journal, Oct. 2013 at 53.

## B. The Advisory Guidelines Calculation

We agree with the Probation Department's Guidelines calculation. (*See* PSR ¶ 24.) Mr. Chon pleaded guilty to a violation of 26 U.S.C. § 7202. His base offense level is 16. (*See id.* ¶ 20.) Mr. Chon swiftly and clearly accepted responsibility and is entitled to a three-level reduction, resulting in a total offense level of 13. (*See id.* ¶¶ 22-24.)

Importantly, after the PSR was issued, the U.S. Sentencing Commission adopted particularly significant amendments to the Guidelines.[8] A new section, USSG § 4C1.1, mandates an additional two-point reduction for qualifying "zero-point offenders" such as Mr. Chon. Accordingly, the total offense level should be further reduced to level 11, with an advisory sentencing range of 8-14 months' imprisonment, and which falls within "Zone B" of the Sentencing Table. The Commission has further emphasized that, in cases where a "defendant received an adjustment under new § 4C1.1 and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, *a sentence other than a sentence of imprisonment . . . is generally appropriate.*" (emphasis added.)[9] We submit that the new Guideline and applicable Sentencing Commission commentary weigh strongly in favor of a probationary sentence in Mr. Chon's case.

## C. The Sentencing Factors Support a Non-Custodial Sentence

Although the Court need not "precisely identify the § 3553(a) factors or address specific arguments bearing on their application." *United States v. Fernandez*, 443 F.3d 19, 29 (2d Cir.

---

[8] The adopted Guidelines amendments are expected to become effective on November 1, 2023 (prior to Mr. Chon's sentencing hearing) unless Congress acts otherwise. As of the date that this memorandum is being filed there is no indication that Congress intends to do so.

[9] *See* U.S. Sentencing Commission, "Amendments to the Sentencing Guidelines" (Apr. 24, 2023) at 80.

2006), abrogated on other grounds by *Rita v. United States*, 551 U.S. 338 (2007). we nevertheless address each of those factors:

### Factor (1): the nature and circumstances of the offense and the history and characteristics of the defendant: 18 U.S.C. § 3553(a)(1)

As we discussed in Section I, above, while Mr. Chon takes full responsibility for his offense, it is also clear that he took action to correct his mistakes before this investigation started. Spa Castle grew exponentially from one location in Mr. Chon's home territory of Queens to other locations around the country. At the start, Mr. Chon was unused to running a large business (he has now learned how to fill that role), had no accounting background, and did not ensure that that the correct amount of federal payroll taxes was withheld from employees' wages and remitted to the IRS. Spa Castle managers felt pressure to accommodate a relatively small number of specialized workers, such as body scrubbers and massage therapists, who would work only for cash. Mr. Chon was aware that certain employees were paid in cash, and he took steps to eliminate the cash payments and transition to a third-party payroll company before this investigation started. This is confirmed by the fact that unpaid payroll taxes declined dramatically from $144,752.64 in 2014, to $40,576.06 in 2015, and to only $13,910 in 2016. (PSR ¶ 8.)

There is no question that Mr. Chon was working to clean up Spa Castle's bookkeeping and payroll.

A certified public accountant previously employed at Spa Castle writes:

*Due to the rapid growth of the business and Mr. Chon mostly working on the various jobsites, ...many of the bookkeeping and tax accounting functions were handled in an ad-hoc manner by some of the company's original employees, none of whom had any formal education or experience with corporate finance or accounting. The books and records of the company were a mess... I applied my training and experience to address numerous prior bookkeeping and accounting mistakes and irregularities. With Mr. Chon's support, I also participated in hiring*

23

*Klichs, a sophisticated accounting and auditing firm… Mr. Chon followed my*
*advice, and, in time, [Spa Castle's] corporate records and tax reporting were*
*corrected and regularized.*

(Sam Lee Ltr., Exh. P.)

As to Mr. Chon's history and characteristics, we believe we have demonstrated throughout this submission his stellar history of hard work, charity, and as someone always poised to help others, including employees at the lowest levels within the Spa Castle businesses.

**Factor (2): [T]he need for the sentence to**:

> **Reflect the seriousness of the offense, to promote respect for the law,**
> **and to provide just punishment for the offense; and to afford**
> **adequate deterrence to criminal conduct. Sections 3553(a)(2)(A)**
> **& (B)**

Failure to withhold and pay payroll taxes is a serious offense, but the extenuating circumstances discussed above help to put Mr. Chon's offense in context. Other payroll tax sentences strongly suggest that just punishment here does not include incarceration. In a very recent case, *United States v. McCarthy*, No. 1:22-cr-00491, 2023 WL 3741996 (E.D.N.Y. May 30, 2023), the defendant caused his business to fail to pay $612,829.27 in federal payroll tax, three times the unpaid federal payroll tax of $199,238.70 in this case. The Guidelines level in *McCarthy*, was 17, corresponding to 24 to 30 months, *id*., at *1, significantly higher than Mr. Chon's range of 13, which, as we argue above, should, taking into account the new and retroactive USSG § 4C1.1, be reduced to 11, corresponding to 8-to-14 months. The court sentenced the defendant to two years' probation and 100 hours of community service where, in a description that equally describes Mr. Chon, the defendant's "conduct appears to be a significant aberration from his otherwise productive and law-abiding life, devoid of any previous criminal conduct." *Id*., at *1. The defendant in *McCarthy* was, like Mr. Chon, "a meaningful source of support" to his community and, again like Mr. Chon, "never intended to violate the law over the

long term." *Id*., at *3. Mr. Chon's conduct is less grave than the defendant's in *McCarthy*, and a sentence of probation with some community service is therefore more than sufficient in this case.

This is borne out by *United States v. Retizenstein*, No. 15-CR-0643, 2016 WL 1745672 (E.D.N.Y May 2, 2016), where the defendant likewise did not pay payroll taxes, there $389,439 as opposed to the $199,238 here. *Id*., at *1. The adjusted offense level was 15, with a Guidelines range of 18-24 months, significantly higher than Mr. Chon's. Nevertheless, the court determined that "a custodial sentence is unnecessary," because the defendant had, like Mr. Chon, demonstrated genuine remorse, and, because, as here, the "offense was an isolated incident inconsistent with defendant's general character." *Id*., at *3. The court sentenced the defendant to three years' probation and 500 hours of community service. *Retizenstein*, like *McCarthy*, indicates that probation is warranted here, where the Guidelines level is significantly lower.

With respect to adequate deterrence, probation is by no means an insignificant sentence. In its landmark *Gall* decision, the Supreme Court emphasized that "[o]ffenders on probation are subject to several standard conditions that substantially restrict their liberty," and affirmed a sentence of probation for a drug trafficker with an advisory Guidelines range of 30 to 37 months' imprisonment, *Gall*, 552 U.S. at 43. The Supreme Court rejected the appellate court's characterization of the difference between 30 to 37 months' imprisonment and probation as "extraordinary" because it was "a 100% downward variance," reasoning:

> [A] sentence of probation will *always* be a 100% departure regardless of whether the Guidelines range is 1 month or 100 years. Moreover, quantifying the variance as a certain percentage of the maximum, minimum, or median prison sentence recommended by the Guidelines gives no weight to the "substantial restriction of freedom" involved in a term of supervised release or probation.

*Id*. at 45, 48 (emphasis added). The court emphasized that:

> Offenders on probation … must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Id*. at 48.  Probation is the appropriate sentence for Mr. Chon.

**Factor (3):  to protect the public from further crimes of the defendant; and to**

>**provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; Sections 3553(a)(2)(C) & (D).**

Little need be said here. There is absolutely no indication that Mr. Chon will ever offend again, and he needs none of the services listed in subsection (D).

**Factors (4), (5) & (6): the kinds of sentences available; the kinds of sentence and sentencing range; and any pertinent policy statement; Sections 3553(3), (4) & (5)**

We believe we already adequately discussed all these factors in "Applicable Legal Standards," above, including the new USSG § 4C1.1 and the Sentencing Commission's new policy statement under USSG § 5C1.1 that, in the circumstances here "a sentence other than a sentence of imprisonment . . . is generally appropriate."

**Factor (7):  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

We have addressed this issue in the discussion of cases under Section 3553(2)(A) & (B), which shows that probation here is in accord with similar cases with similar defendants and similar conduct.

**Factor (8):  the need to provide restitution to any victims of the offense**

Mr. Chon has already made full restitution.  (PSR ¶ 70.)

## V.    CONCLUSION

Mr. Chon made a serious mistake during the course of an otherwise very honorable life. He has acknowledged his wrongdoing, and he has already paid dearly for it, personally, and

professionally. Mr. Chon made full restitution to the IRS even before he acknowledged his guilt at his initial appearance and plea hearing. He is deeply remorseful for the conduct that led to this long investigation and, ultimately, the guilty plea that now brings him before the Court on what will without doubt be the saddest day of Mr. Chon's otherwise earnest, hardworking, and productive life. He was working to improve his companies' books and records prior to the investigation. He poses absolutely no risk of reoffending. There is no meaningful benefit to society by sending him to prison for any period of time. The opposite is true, and a sentence of incarceration is likely to adversely affect hundreds of the companies' employees. Finally, the Sentencing Commission itself recently adopted amendments to the Guidelines that encourage probationary sentences in cases such as this. For all of the foregoing reasons, we respectfully request that the Court impose a probationary sentence in Mr. Chon's case.

Dated: October 6, 2023

Respectfully submitted,

KOSTELANETZ LLP
 By: /s/Bryan C. Skarlatos
7 World Trade Center
New York, New York 10007
 (212) 808-8100
bskarlatos@kostelanetz.com

/s/Brian P. Ketcham
Brian P. Ketcham
KETCHAM LAW PLLC
52 Duane Street
New York, NY 10007
(212) 518.6380
bk@ketchampllc.com

*Attorneys for Steve Sung Chon*