# EXHIBIT P

July 10, 2023

Hon. LeShann DeArcy Hall
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge DeArcy Hall:

I write to express my support for my former employer, Steve Chon. Mr. Chon is the founder and president of C-Castle Group, a company which operates a group of Korean-style spa facilities in several locations in the United States, including Spa Castle in College Point, Queens.

Years ago, Mr. Chon came up with the idea of planning and designing spa facilities based on examples he had seen when he visited spas in Korea. Mr. Chon is a master plumber and an engineer, so he was able to design and build the spas himself based on original plans he dreamed of and then created. Unlike other traditional business owners, you will most often find him working on jobsites, handling construction projects, or dealing with complicated industrial plumbing issues. Mr. Chon is not businessman or financial expert who spends a lot of time in the office.

After Mr. Chon opened the original Spa Castle in Queens, the company grew very quickly and opened another facility in Texas, mid-town Manhattan, and Virginia. Eventually, the company went on to open a hotel in Queens and Texas.

Due to the rapid growth of the business and Mr. Chon mostly working on the various jobsites, though, many of the bookkeeping and tax accounting functions were handled in an ad-hoc manner by some of the company's original employees, none of whom had any formal education or experience with corporate finance or accounting. The books and records of the company were a mess at the time as a result. Mr. Chon came to understand that the company's finances needed to be addressed and hired me in 2014 to help bring things under control. I am a certified public accountant and had previous experience as a corporate financial officer. I applied my training and experience to address numerous prior bookkeeping and accounting mistakes and irregularities. With Mr. Chon's support, I also participated in hiring Klichs, a sophisticated accounting and auditing firm that was able to properly and independently prepare various corporate and personal income tax returns and provide auditing services, and I understand that Klichs is still providing those services. Mr. Chon followed my advice, and, in time, C-Castle's corporate records and tax reporting were corrected and regularized.

During the course of my work for the company as the Chief Financial Officer, which lasted from 2014 to 2020, I came to learn about Mr. Chon's history and his dedication to Spa Castle and its hard-working employees. Mr. Chon is devoted to his business and is proud to employ many people from the local communities where his spas are located. Many of his employees are recent immigrants, some of whom do not speak only limited English would have a difficult time finding a job otherwise. Among the group of spas, Mr. Chon employed approximately 300 people – from managers to cleaners, and Mr. Chon treats all of the spas' workers with respect. I can also say that Mr. Chon himself works harder than anyone else at the company – not just on corporate decisions, but more often with tasks that involve physical labor or construction and maintenance issues.

Lastly, I have also observed during my time with the company that, despite the hard effort and long hours he gives to the company, he is very devoted to his family. It is obvious to everyone at the company that deep down his true goal is to provide his children, and his parents and extended family with a better future here.

Thank you Judge DeArcy Hall for reading this letter and for your consideration of Mr. Chon. He is a good person who I am sure will never get into trouble again. I know he has learned a very hard lesson as a result of this case.

Sincerely,

Sam Lee
REDACTED

# EXHIBIT Q

Jong Hwan No
REDACTED

June 29, 2023

The Honorable Lashann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge DeArcy Hall,

My name is Jong Hwan No. I own a wholesale meat distribution business located in Hunts Point Market in Bronx. Several members of my family are or have been in the food related business for many years. I have known Steve Chon for over 30 years and have seen him grow his business from a small engineering company to a very successful spa owner. My family and Steve have become very close in the last 15 years or so. I have gotten to know many Korean American business owners because my meat distribution business serves that community for the last 33 years. Steve is one of only handful of Korean Americans who have not only become successful and famous in the Korean community but who also have not lost his roots and positively contributes back to the local community.

I remember vividly when my mother's restaurant caught fire back in 2006. Because the fire started near the kitchen, the fire department closed the gas and electric and the restaurant was a complete mess. When Con-Edison closes its services, it normally takes several days in order for Con-Edison to restore its services. Having no electric or gas for a restaurant is a great deal for the owners because of lost revenue and the possibility of their patrons going to the competitors. At the time of this incident, Steve and my family weren't close as we are now. Surprisingly, Steve came to my mother's restaurant on the day of the fire to help deal with Con-Edison and the damages caused by the fire. Steve helped us like we were one of his family members, and I remember my mother being so thankful to Steve. With Steve's help, my mother was able to open the restaurant the following day. I realized later that many business owners relied on Steve very much because he would go out of his way to sincerely help them as if they were a member of his family in need of help. Steve's reputation in the community, as I have witnessed, is that of a person who is very dependable and helps others in the community.

I am not as successful as Steve but I do make a comfortable living, and like Steve, I try to pay back to my community when I can. My daughter-in-law is a New York City Council member and we try to make Queens a better place. One of several events that my mother and I organized involved providing free lunch on Mother's and Father's Day at my mother's restaurant every year. It was a wonderful event that lasted over 10 years but it abruptly ended because of COVID and my mother's death. We had organized raffle tickets and various other things to give

away boxes of meat and we donated the proceeds to number of other local organizations. Steve would always donate money to each and every one of these events but he insisted that we don't mention Spa Castle or his name. We were always thankful for his donation and kept his donations anonymous for over 10 years.

I hope that your honor will consider Steve outside of what he has been accused of doing or found guilty of. He is a very passionate person and truly cares for people and the community. He is a very good man, always willing to help people around him, and tries to pay back to the community at every opportunity. He is someone who has made a difference in the community and many lives and is someone that many people in our community depend on.

Sincerely,

Jong Hwan No

8/22/23

# EXHIBIT R

Kevin O'Donnell
Director of Security
Madison Security Group Inc.
REDACTED

Office: (718)509-1347
Cell: (516)272-6094

May 29, 2023

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Honorable Judge DeArcy Hall,

My name is Kevin O'Donnell. I am a retired Community Affairs Officer and Detective for the New York City Police Department, 109th Precinct, from 2007 to 2020, and I have known Mr. Steven Chon for over 10 years.

I had first heard about Mr. Chon through talks in the press and the community around 2006, when he was trying to apply for a Special Business Permit to open and operate a modern Korean bathhouse and spa, something that at the time was not heard of in America, though after Spa Castle, many others followed. There were protests because people confused the family spa with a sex-related business. In particular, one councilman used Mr. Chon's development as a scapegoat, trying to stop his approval process and opening. I remember a Community Board meeting where very passionate critics were protesting the approval. Mr. Chon stood there, listened to what people were saying, and clearly presented his ideas to bring healing traditions from Korea and Europe to the community and to create over 100 direct jobs for the community. His road to success had a very challenging start but he fought through it all and proved everyone wrong.

As Spa Castle was completed and opened, Mr. Chon made sure to give back to the community in one way or another. His donations to our Annual Children's Christmas Party helped give those families a present from Santa and a hot lunch. Most of the attendees are families who have lost a family member or don't have a family to celebrate with, making this a very special event for the community.

Mr. Chon has also generously donated to support a community National Night Against Crime event where the community comes out to enjoy a mini-carnival with free pony rides, bouncy houses, balloon animals, and face painting. In addition, just last year, Spa Castle and Steve Chon helped support the Children's Halloween Parade in College Point, where families enjoy a safe and fun day trick-or-treating. Over 3,000 people attended the event and the positive impact it had to the children in the community was immense.

Mr. Chon also goes further to support those who work for the community, including the local fire and police departments. Mr. Chon and his staff at Spa Castle would host luncheons for the officers at our precinct or bring ice cream during hot summer days. After Hurricane Sandy when many of the officers were left with no power to their homes, his support and help extended out to them. The most impressive thing to know is that he never wanted any recognition for what he did. So, none of his many community contributions were documented in the newspapers and he always declined accepting any formal public thank you or appreciation.

To hear and see the recent news regarding Mr. Chon, it was news that goes against anything I have known of him. Though he must accept the consequences of whatever had transpired, I and the rest of the community who truly know of Mr. Chon know that he is a decent, kind, and extremely generous pillar of the community, who has done so much to support our community.

Your Honor, as someone who has dedicated my life to both law enforcement and supporting our local community, I ask that you understand the good that Mr. Chon does, and take into consideration that it would be a terrible waste and loss to the community if he is incarcerated where he can do no good to anyone.

Respectfully yours,

Kevin O'Donnell

# EXHIBIT S



*Vincent Randazzo*

REDACTED

(917) 548-3778

May 18, 2023

The Honorable Lashann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge DeArcy Hall,

     I am writing on behalf of Mr. Steve Chon. My name is Vincent Randazzo. I am a Real Estate Broker for over 50 years and Real Estate Developer for over 40 years. I have done many major real estate development projects over that time. These Real Estate development projects over the years have been done mostly in the Flushing, Queens, New York Area. The Projects have ranged from large Mixed Use buildings to 1 and 2 family homes.

     I met Steve Chon back in 2003 when he purchased a parcel of land next to my property on Northern Blvd in Flushing New York. Mr. Chon subsequently built a building with retail stores and offices at his location. From our initial meetings as neighbors, I could tell that Mr. Chon was a man of good character and was very knowledgeable about real estate, all self-taught. I ended up hiring Mr. Chon as an engineer/architect for the development of the building that I built on Northern Blvd in 2005 next to Mr. Chon's building. This project was very complicated, because it consisted of four different tax lots and was also built in two different stages. Mr. Chon's professionalism and commitment to excellence showed through the entire two years project. Mr. Chon was able to conduct himself in a professional manner while simultaneous befriending me. I couldn't help wanting to work with him again because of his courteousness and caring. Mr. Chon performed all his job tasks with pride and excellence and everything was ahead of any deadline. When deciding to hire an Engineer/Architect for a project, money is not the only factor. You must be able to trust this individual, the person must be stable, competent and be able to complete the task that I would be committing large amounts of money to. It is a huge financial risk to develop a building, so many things could potentially go wrong. But having a quality individual like Mr. Chon on your team mitigates the risk exponentially. I have gone on to hire Mr. Chon as Engineer/Architect for other large projects in 2008 on Sanford Ave and 2011 on 46th Ave in Flushing. Each of these projects took multiple years. I still continue to work with him on various projects even until this day.

     Our longstanding work relationship has morphed into a true friendship. Mr. Chon is a devoted, caring, loving husband and father. He is respected and well-liked by all in the community. He really is a genuine and sincere person who puts other's needs before

his own. In a time of need, he is the one person you can count on and he helps out with no questions asked. He is someone who makes a difference with everything he does.

I hope the court considers the positive impact that Steve Chon has on the community as well as the tremendous responsibility Steve Chon has to completing such vital tasks in Engineering/Architecture in the neighborhood, when making your decision. Please feel free to contact me if you have any questions (917) 548-3778

Respectfully,

Vincent Randazzo

# EXHIBIT T

Hon. LeShann DeArcy Hall
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge DeArcy Hall:

My name is Won Chul Yi.  I came to America in 1998 with my wife and 1 year old daughter to seek a better life for us.  I was a plumber in Korea and looked for opportunities in plumbing when I immigrated to America.

I first met Mr. Chon in 1999 when I was looking for a plumber job.  I saw a help wanted advertisement in a Korean newspaper.  Mr. Chon was the person that interviewed me for the job which led me to work for him for over 5 years.  Mr. Chon was a tough boss because he was very detailed and always pushing his employees to do learn and advance in their field.  For example, although I came to America with over 7 years of plumbing experience, I needed to learn the building code in New York and the American culture.  Mr. Chon constantly encouraged me and taught me the building code and taught me how to live in America.  I was able to learn and acquire much experience thanks to Mr. Chon.  Many times after a hard day of work, Mr. Chon will take all of employees out to have dinner.  In those countless dinners with Mr. Chon, he would share how to efficiently deal with the New York City inspections and the Building's department.  He would always lend a helping hand or share valuable experience which I still apply to this day.

You see, Mr. Chon wasn't just a boss who delegated work to us, but he worked alongside with us and got his hands dirty.  He didn't like staying in the office.  No work was ever below his status as boss, and he was always forward thinker and never looked back.  Many employees, myself included, looked up to him for his leadership and vision.  In 2003, I stopped working for Mr. Chon to start my own company doing plumbing and ansul (?) system.  To my surprise, Mr. Chon was supportive of my decision although we were in the same industry competing for Korean owned businesses.  I knew that Mr. Chon was truly a man of his word when he hired me to help him build Spa Castle in College Point in early 2006.  He also hired me to help in construct Premier 57 located in Mid-town, and more recently Spa Forest in Virginia in 2022.

My father passed away in 2010.  Before the Korean war and the resulting division of Korea, my father was from the North Korea region before he fled for South Korea.  Since Mr. Chon's father was also a war refugee from North Korea he was always extra nice to my father.  And I remember as my father was dying of old age, he told me to always try to work with Mr. Chon because he was a man of his word and trustworthy.  My father believed that I will be successful and trustworthy like Mr. Chon if I remained in a working relationship with him.

Mr. Chon's character is always to be a giver rather than a receiver.  He provides examples not by words but by action.  I always remain thankful to him for helping me settle down in America, encouraging me to always apply myself to be better, and even though I was his competitor, he would support me by giving me work.

Other than what I have read in the Korean newspapers, I don't know the details as to the reason for Mr. Chon getting in trouble with the law. What I do know is that Mr. Chon is a trustworthy man and always willing to help people in need of help. This is the man I have known for the past 28 years. Please forgive him if he did anything wrong. Though I am not very good at writing my thoughts, thank you Judge for reading my letter.

Won Chul Yi

REDACTED

July 8, 2023

Hon. LeShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

존경하는 디아시 홀 판사님께,

저의 이름은 이원철입니다. 저는 아내와 1살 딸과 함께 1998년에 미국으로 왔습니다. 더 나은 삶을 찾기 위해 이민을 왔습니다. 한국에서 배관공으로 일하던 저는 미국으로 이민온 후에도 배관 분야에서 기회를 찾기 시작했습니다.

저는 처음으로 전회장님을 만난 건 1999년, 배관공 일자리를 찾던 중이었을 때였습니다. 한국 신문에 구인 광고를 보았고, 그 일자리에 지원하게 되었습니다. 전회장님은 그 일자리에 대한 저의 면접관이었으며, 그로 인해 5년 이상 그분아래에서 일을 하게 되었습니다. 전회장님은 매우 세심하고 항상 직원들에게 더 배우고 진전하도록 격려하셨지만 일에대해서 엄격한 사장였습니다. 예를 들어, 제가 미국에 와서도 7년 이상의 배관 경험을 가지고 있었지만, 뉴욕의 건축 규정과 미국 문화를 배워야 했습니다. 전회장님은 항상 저를 격려하며 건축 규정을 직접 가르쳐 주셨고, 미국 생활 방법도 가르쳐 주셨습니다. 전회장님 덕분에 많은 경험을 얻고 배울 수 있었습니다. 힘들게 일한 후에도 전회장님은 종종 모든 직원들을 모아 저녁 식사를 사주셨습니다. 무수한 저녁 식사에서 전회장님은 뉴욕 시의 검사 및 건물 관리 부서와 효율적으로 대처하는 방법을 알려주셨습니다. 그는 저희에게 도움을 주셨고 소중한 경험을 나누어 주셨으며, 그것은 오늘날까지도 저에게 큰 도움이 되고 있습니다.

전회장님은 저희에게 작업을 위임하는 사장이 아니라, 우리와 함께 일하고 심지어 손 더럽히는 일도 꺼리지 않는 사람이었습니다. 그는 사무실에 머무는 것을 싫어했습니다. 어떤 일도 회장님은 궂은 일도 마다하지 않고 하셨으며, 항상 미래를 바라보며 전진하는 사람이었습니다. 저를 포함 많은 직원들은 그의 리더십과 비전을 존경합니다. 2003년, 제가 나만의 배관 및 Ansul 시스템 회사를 시작하려고 전회장님의 일을 그만두게되었습니다. 놀랍게도 우리는 같은 산업에서 경쟁하는 입장이었지만, 전회장님은 제 결정을 지원해 주었습니다. 2006년 초에는 저를 College Point에 있는 Spa Castle 을 건설하는데에 고용하였고, 그 후에는 Mid-town에 위치한 Premier 57 및 최근에는 2022년 버지니아에 위치한 Spa Forest 의 건설에도 도움을 주었습니다.

저의 아버지는 2010년에 돌아가셨습니다. 한국 전쟁과 그로 인한 한국의 분단 전에, 제 아버지는 북한 지역 출신으로 남한으로 피난을 왔습니다. 전회장님의 아버지도 북한에서 전쟁으로 인한 난민이었기 때문에 그는 항상 제 아버지에게 특별한 배려를 베풀었습니다. 그리고 제 아버지가 늙어가며 죽어가는 모습을 보면서 그는 항상 전회장님과 관계를 유지하라고 저에게 말씀하셨습니다. 제 아버지는 전회장님은 믿을만한 사람이라고

하셨습니다. 만약 제가 전회장님과 계속 같이 일하게된다면, 저도 성공 하고
믿음직한사람이 될 것이라고 생각하셨습니다.

무엇보다도 전회장님의 성격은 받는 사람보다 주는 사람이었습니다. 그는 말로가 아닌
행동으로 본보기를 제공했습니다. 저는 항상 그에게 미국에서 안정적으로 정착하는 데
도움을 주셔서 감사하게 생각하며, 더 나은 사람이 되기 위해 항상 노력하도록 격려해
주셔서 감사하게 생각합니다. 무엇보다 경쟁자임에도 불구하고 일을 주어 저를 지원해
주셔서 감사하게 생각하고 있습니다.

한국 신문에서 읽은 것 외에는, 전회장님이 왜 법적 문제에 처한 것인지에 대한 자세한
내용은 알지 못합니다. 하지만 제가 알고 있는 것은 전회장님이 믿을 수 있는 사람이며,
도움이 필요한 사람들을 언제나 도와주기를 원하는 사람임을 알고 있습니다. 이것이 바로
저에게 28 년 동안 알려진 전회장님입니다. 그가 무언가 잘못한 일이 있다면, 그를 용서해
주십시오. 제 생각을 글로 표현하는 것은 잘하지 못하지만 저의 편지를 읽어 주셔서
판사님께 감사드립니다.

이원철 드림

REDACTED

July 8, 2023

# EXHIBIT U

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES :

         :

v. :      Docket No. 1:22CR00259-001(LDH)

         :

SUNG SOO CHON :

---

## **DECLARATION OF SCOTT HUR**

I, SCOTT HUR, in accordance with 28 U.S.C. § 1746, declare under penalty of perjury

that the following is true and correct:

1.      I am an attorney admitted to practice before the Courts of the State of New York

and the United States District Courts for the Southern and Eastern Districts of New York.

2.      I am fluent in both Korean and English.

3.      I translated from Korean into English certain letters submitted as exhibits

to Mr. Chon's sentencing submission in the above-captioned matter as follows: Exhibit J

(Jude Hwang), Exhibit O (June Ho Lee), and Exhibit T (Won Chul Yi).

4.      I certify that my translations of these letters are true and accurate.

Executed on October 4, 2023

                                    Scott Hur

# EXHIBIT V

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA

CR-13-0262

        -against-              :
                                 United States Courthouse
                                 Central Islip, New York
RONALD HINDERHOFER,

     Defendant.               :
                                 January 17, 2014
- - - - - - - - - - - - - - - - X    9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        LORETTA E. LYNCH
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  RAYMOND TIERNEY, ESQ.
                           Assistant United States Attorney


For the Defendant:         ROBERT S. FINK, ESQ.




Court Reporter:            Mary Ann Steiger
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6101

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

1          THE CLERK:  Criminal cause for sentencing,

2     CR-13-0262, United States of America vs. Ronald

3     Hinderhofer.

4          THE COURT:  Appearances, please.

5          MR. TIERNEY:  For the government, Raymond

6     Tierney.

7          Also appearing for the United States Probation

8     office is Officer Linda Fowle, and for the IRS is Special

9     Agent Eric Jonke, J-O-N-K-E.

10          Good morning, your Honor.

11          THE COURT:  Good morning.

12          MR. FINK:  For the defendant Ronald Hinderhofer,

13     it's Robert S. Fink.

14          Good morning.

15          THE COURT:  Good morning.

16          Do we have to be concerned about victims'

17     rights, Mr. Tierney?

18          MR. TIERNEY:  No, your Honor.

19          THE COURT:  Is there a plea agreement here?

20          MR. TIERNEY:  There is, your Honor.

21          THE COURT:  Can I see it?

22          MR. TIERNEY:  Yes, your Honor.

23          (Document handed.)

24          (Pause in proceedings.)

25          THE COURT:  Return this, please.

1          (Document handed.)

2          THE COURT:  Do you want to rise,

3    Mr. Hinderhofer.

4          You are Ronald Hinderhofer?

5          THE DEFENDANT:  Yes, sir.  Yes, I am, your

6    Honor.

7          THE COURT:  In previous proceedings in this

8    matter, a determination of guilt was made that you are

9    guilty of the crime of willful failure to collect and pay

10   over tax, a Class D felony.

11         Based on that determination of guilt, it is now

12   the judgment of this Court that you are guilty of that

13   crime.

14         I have considered the file in this case and the

15   presentence report and recommendation, and the following

16   documents:

17         The letters from Robert S. Fink, Esq., dated

18   September 2nd, 2013, and January 15, 2014; the Vale report

19   dated May 3rd, 2013; the request for sentence date

20   memorandum from Senior United States Probation Officer

21   Linda I. Fowle dated July 18, 2013; the addendum to the

22   presentence report dated August 16, 2013; and the letter

23   from Assistant United States Attorney Raymond A. Tierney

24   dated January 10, 2014.

25         Has your client spent any time in custody as of

1  now, Mr. Fink?

2          MR. FINK:  No, your Honor.

3          THE COURT:  Mr. Fink, have you reviewed the

4  presentence report and the addendum with the defendant?

5          MR. FINK:  I have, your Honor.

6          THE COURT:  Are there any errors in the

7  presentence report or the addendum?

8          MR. FINK:  No, your Honor.

9          THE COURT:  Mr. Hinderhofer, have you reviewed

10  the presentence report and the addendum?  The addendum is

11  the addition to the presentence report.

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Are there any errors in the

14  presentence report or the addendum?

15          THE DEFENDANT: No, your Honor.

16          THE COURT:  Mr. Tierney, have you reviewed the

17  presentence report and the addendum?

18          MR. TIERNEY:  I have, your Honor.

19          THE COURT:  Are there any errors in those

20  documents?

21          MR. TIERNEY:  No, your Honor.

22          THE COURT:  Mr. Hinderhofer, are you satisfied

23  with the representation provided to you by your attorney,

24  Robert S. Fink, Esq.?

25          THE DEFENDANT:  Yes, your Honor.

1    THE COURT:  Mr. Fink, do you have anything you

2  would like to say or present on behalf of the defendant

3  before sentencing?

4           MR. FINK:  Yes, your Honor.

5           THE COURT:  Get to the microphone, please.

6           MR. FINK:  I will try not to repeat what's in

7  the presence sentence report since I know your Honor is

8  aware of it, but I would like to say that I think there

9  are three factors in this case that make this case

10  different from most tax cases and all of which would lean

11  towards a sentence of leniency.

12           The first factor is that unlike most tax cases,

13  there is no personal aggrandizement, no personal gain,

14  that Mr. Hinderhofer received from these funds.

15           These funds were all basically -- well, people

16  think of these cases as though there's a pot of gold that

17  you collected and is there and you can use.

18           There is no pot of gold.  He didn't charge -- he

19  didn't get the tax, he didn't pay over the tax.  He was

20  wrong, but it's no personal gain that he had.

21           It was all done basically for his employees, to

22  keep his employees as a home builder.

23           He had a very tough life.  You saw from the

24  presentence report he was abandoned by his mother.  He

25  lived in two bedrooms with five siblings.  He was a

laborer from the age of 14, and he now has a hand-to-mouth business where he does home repairs.  Basically he's been saved by Sandy, the hurricane, which has permitted him to stay in business since the time of this event.

Another thing that distinguishes this case from other cases is that as soon as the IRS agents came to him, he confessed and he told the IRS agents the absolute truth.

And that meant not only did he save the Court and the government the time of trial, but he saved the Court the time of investigation as well.

Then he went further to make up for his wrongdoing.  He cooperated with the government and he gave the government what I felt was a great deal of very useful evidence.

Now, I don't know if the IRS is investigating any of these matters.  They may be.  There's been nothing brought to the Department of Justice yet.  He has not gotten a 5K1, but now we understand that this is a factor that the Court should and must take into consideration in looking at the crime itself.

Perhaps the most important factor I believe in why there should not be incarceration here is, again, Mr. Hinderhofer is a fellow who works six days a week, sometimes seven.  He works with his hands.  He has eight

1  employees, but he is there with them.  He does all the

2  estimating, all the ordering.  He is the boss.  He gets

3  all the business, he does the work.

4         Yes, he has laborers.  But if he goes to jail,

5  the business is over.  Eight families are out of work,

6  eight men are out of work, which is a sad thing in this

7  economy which there is not much work to get.

8         For those three reasons where I think this

9  distinguishes this case from most, I believe this should

10  be a sentence that does not include incarceration.

11         Thank you.

12         THE COURT:  Mr. Hinderhofer, do you have

13  anything to say or present on your own behalf before

14  sentence is imposed?

15         THE DEFENDANT:  Yeah.  I would just like to

16  apologize for my actions and if there's any way for me to

17  make the restitution, given the chance, I will.  That's

18  it.

19         THE COURT:  Thank you.

20         MR. FINK:  By the way, your Honor, there already

21  has been periodic payments of restitution.

22         THE COURT:  Has there been?

23         MR. FINK:  Yes.

24         THE COURT:  The restitution is 500 some-odd

25  thousand dollars, right?

```
1          MR. FINK:  Yes.  He has a long way to go but...

2          THE COURT:  How much has he paid?

3          MR. FINK:  He's paid I think something like 10,

4     $12,000.

5          THE COURT:  That goes to the government, all of

6     that?

7          MR. FINK:  Yes.

8          THE COURT:  Mr. Tierney, is there anything you

9     would like to say or present before sentence is imposed?

10         MR. TIERNEY:  Yes, your Honor, briefly.

11         Like Mr. Fink, your Honor, I would just like to

12    rely upon my sentencing memorandum dated January 10.

13         And I'm not going -- I'm going to try not to

14    repeat what I have already written in that letter, your

15    Honor, because I know that you've considered that letter.

16         Your Honor, with regard to this case, just

17    briefly, the information contained in the defense

18    sentencing memorandum, the government agrees with most of

19    it, and given the 3553(a) factors, your Honor, the

20    government does concede and does agree that a below

21    guidelines sentence is warranted in this case.

22         With regard to the factors of general and

23    specific deterrence, we're recommending a sentence of a

24    year of incarceration.

25         However, your Honor, with regard to that below
```

1    guideline sentencing, that obviously is in your -- the

2    sentence in this case is in your sound discretion.

3            With regard to the factors in this case, your

4    Honor, I handled a few of these cases.  Obviously the

5    agents with the IRS have handled a great many more.

6            And with regard to this case, I don't see it as

7    all that extraordinary.  Most of the people are otherwise

8    hard-working people who failed to pay their taxes, as

9    occurred in this case.

10           With regard to the investigation in this case,

11   your Honor, the defendant did have -- or the defendant's

12   business did have approximately $3.9 million in cash

13   expenses over two years, which is a tremendous amount of

14   cash expenses.

15           To the defendant's credit, he did sit down with

16   the IRS agents and the IRS agents were very conservative

17   with regard to calculating the tax loss in this case with

18   the help of counsel and with the help of the defendant.

19           With regard to the assistance provided to the

20   government, your Honor, I would stand by my January 10th

21   letter.

22           And, briefly, I would like to respond to

23   counsel's letter of January 15th, not because I think it

24   factors significantly in the determination of the

25   sentence, I do however feel it factors upon my credibility

1 as a prosecutor, your Honor.

2        With regard to the statute of limitations waiver

3 in this case, initially the defense did execute a statute

4 of limitations waiver. That waiver ran out on November

5 5th, 2012. On that date I sent a renewal of the statute

6 of limitations waiver to the defense.

7        At that time I was told that because of

8 Hurricane Sandy, they're unable to get in contact with

9 their client and they would get back to me.

10        A few weeks later they got back to me. They

11 indicated that they were not going to execute that statute

12 of limitations toll. That's fine. I have no problem with

13 that.

14        It was just, at that point, that any thought of

15 proactive cooperation in this case would necessarily --

16 wouldn't necessarily be considered by the office.

17        And over and above that, your Honor, given the

18 nature of the assistance that was provided, which has been

19 detailed in my letter and should be considered by you, it

20 wasn't deemed to be anything that we were going to use

21 proactively to try and make cases. That's why the

22 defendant didn't get a 5K in this case. That doesn't

23 diminish the information which he provided and the

24 information which is in my letter.

25        With regard to the alleged marijuana conspiracy,

1  I spoke with Mr. Fink personally and I stand by my

2  statements that I made in my sentencing memorandum.

3          Again, your Honor, the bigger issue in this case

4  is the sentence in this case.  The government certainly

5  agrees with the defense in the sense that there should be

6  a below guideline sentence.

7          Our recommendation is one year but, of course,

8  your Honor, the sentence in this case we leave to your

9  sound discretion and I thank you for your courtesy, your

10  Honor.

11          MR. FINK:  May I just say one word?

12          THE COURT:  I was going to say, anything else

13  you want to say, Mr. Fink?  You beat me to it.

14          MR. FINK:  Thank you.

15          The Tax Division of the Department of Justice

16  has issued a directive to all U.S. Attorney's Offices that

17  they must ask for a sentence of incarceration in all tax

18  cases.

19          THE COURT: Is that right?

20          MR. FINK:  Yes.

21          That actually is contrary to the -- I use the

22  word mandate of the United States Supreme Court which says

23  you look at all of the factors and make a determination.

24  You don't blindly say; you have to go to jail.  But that's

25  what they did.

1          And so I think that Mr. Tierney is bound to ask

2    for that.  They ask for that in every case and in my mind

3    it doesn't mean very much.

4          Thank you.

5          MR. TIERNEY:  May I just respond briefly, your

6    Honor?

7          THE COURT:  Go ahead.

8          MR. TIERNEY:  With regard to my sentence

9    recommendation, I came upon that on my own.

10          THE COURT:  Independently?

11          MR. TIERNEY:  Independently.

12          THE COURT:  Okay.

13          MR. TIERNEY:  Thank you, your Honor.

14          THE COURT:  Is there any legal cause why

15    sentence should not now be pronounced, or anything

16    additional you would like to say, Mr. Fink?

17          MR. FINK:  No, your Honor.

18          THE COURT:  Initially I would like to compliment

19    Mr. Tierney on a very good sentencing memorandum.  He

20    almost persuaded me.  Close.

21          I also would like to compliment Senior United

22    States Probation Officer Linda Fowle who did a very good

23    job in the presentence report and a very fair

24    recommendation in my view.

25          Also, Mr. Fink's letter was very informative and

1 helpful. I appreciate that.

2 The reasons for the Court's imposition of

3 sentence are as follows:

4 I accept the facts in the presentence report.

5 In particular, this defendant, Ronald

6 Hinderhofer, is the owner and operator of a company called

7 RH, Inc., and he failed to truthfully account for and pay

8 over FICA taxes to the IRS, to the government, for the

9 third quarter of 2008, in the amount of $45,941.00.

10 The defendant timely pled after being indicted

11 or was it an information?

12 MR. FINK: An information, your Honor.

13 THE COURT: An information.

14 And he permitted the government to avoid

15 preparing for trial.

16 It appears that since 1984, this defendant,

17 Ronald Hinderhofer, the owner of RH, Inc., a home

18 improvement contracting business which operated from his

19 residence, he had an office apparently in his house, his

20 practice was to employ workers and he paid them in cash.

21 Now, how did he get the cash? Well, the

22 customers that he did the work for paid him by check.

23 Apparently Mr. Hinderhofer took the checks to a check

24 cashing facility, cashed the checks, and paid the

25 employees in cash without deducting the FICA taxes that go

1    to the government.

2            That's the nature of what he did on a long-term

3    basis.  He had a duty to collect and pay these taxes like

4    any other employer and file employer's quarterly federal

5    tax returns.  I think it's an IRS form 941.

6            It's important, very important, that these

7    payments be made by employers because this FICA money, as

8    I understand it, goes to pay Social Security payments and

9    Medicare payments.  So it's extremely important that

10   employers pay their -- deduct this money from the

11   employees' salaries.  But the defendant got the cash by

12   cashing the customers' checks and paid the employees in

13   cash without these deductions. I suppose he could pay them

14   less money by doing that.

15           There was apparently a high turnover of his

16   employees so that the authorities, when they investigated

17   this case, were apparently substantially precluded from

18   interviewing the workers because of this high turnover.

19           The estimated total tax liability not just for

20   the part that he pled guilty, the third quarter of 2008,

21   but his total tax liability for all the time that he did

22   this as relevant conduct was the sum of $573,290.00 that

23   he deprived the government of.  $573,000, that's a lot of

24   money.

25           The defendant apparently paid taxes, his

1  personal income taxes. He reported his taxes properly,

2  but not the employees. He cashed the customers' checks

3  and paid them in cash, saving money and depriving the

4  government.

5       The defendant has agreed to pay restitution of

6  the total tax liability in the sum of $573,290.00.

7       The defendant -- before I get to that, my first

8  obligation is to determine the guideline range and it is

9  total offense level 17, criminal history category I, 24 to

10  30 months.

11       Well, we all know that the guidelines are no

12  longer mandatory, that the United States Supreme Court, in

13  the Booker case, decided that since judges at sentencing,

14  like myself, make many factual decisions which, according

15  to the Supreme Court, some of which should be made by a

16  jury beyond a reasonable doubt.

17       So instead of doing away with the guidelines,

18  they said we're going to leave the guidelines, they're no

19  longer mandatory. The Judge should seriously consider the

20  guidelines, but is not bound by them.

21       Instead, the Supreme Court said there was a

22  statute passed by Congress precisely on this subject, so

23  pay attention to that statute.

24       And that, as referred to by counsel and set

25  forth by the government in Mr. Tierney's letter, is 18

1    United States Code, Section 3553(a), which is entitled

2    imposition of a sentence.

3              Factors to be considered in imposing a sentence.

4              The Court shall impose a sentence sufficient,

5    but not greater than necessary, to comply with the

6    purposes set forth in this subsection.

7              Congress said the Court shall impose, not may,

8    not perhaps, not could, but shall impose a sentence

9    sufficient, but not greater than necessary to comply with

10   the purposes set forth in paragraph 2 of this subsection.

11             The Court, in determining the particular

12   sentence to be imposed, shall consider.  The second time

13   they said that.

14             1. The nature and circumstances of the offense.

15             Well, this was not a good thing to deprive the

16   government of the money they need to pay Social Security

17   payments.

18             Can you imagine if employers did these things

19   what would happen.

20             The nature and circumstances of the offense, the

21   history and characteristics of the defendant.

22             Well, the history and characteristics of the

23   defendant is that he had a difficult childhood.

24             His mother departed from the family house when

25   he was eight years old and he saw her only occasionally.

His father died some time ago, so it was a difficult
childhood.

Fortunately he married and has a stable union
with two children.

The defendant has no criminal history.  He got
into difficulty one time, but never was prosecuted for it,
so he has no criminal history.

He's apparently a very hard worker, has strong
work habits.  Especially since Hurricane Sandy they have
been busy this company.

Continuing with the factors set forth by
Congress.

1. The nature and circumstances of the offense
and the history and characteristics of the defendant.

2. The need for the sentence imposed to reflect
the seriousness of the offense.

And it is a serious offense, to deprive the
government of money they badly need to pay something like
Social Security and Medicare.

To promote respect for the law.

Well, while Mr. Hinderhofer was doing this, he
didn't show much respect for the law to go take customers'
checks, cash them and then pay the employees in cash so
they don't have to take the taxes off.

And a very important reason, to provide just

1  punishment for the offense which the government has been

2  emphasizing.

3          Also, to afford adequate deterrence to criminal

4  conduct.

5          That's what Mr. Tierney relied upon.  He says

6  you should sentence the defendant to incarceration because

7  it would be an example to others not to do this.

8          To protect the public from further crimes of the

9  defendant.

10          Well, I don't think there's going to be any

11  further crimes from this defendant.

12          That's the reasons that Congress has given for

13  sentencing.

14          The defendant has attempted to cooperate with

15  the government.  The government concedes that he met with

16  the government and provided significant information about

17  businesses and individuals in the construction industry

18  who engage in tax evasion and other criminal activity; and

19  certainly that is an important fact even though he didn't

20  get a 5K letter.

21          Counsel for the defendant has emphasized three

22  reasons that I should not sentence this defendant to

23  incarceration.  Those reasons are very important reasons.

24          1.  No personal aggrandizement, no pot of gold.

25          In other words, he didn't spare himself tax

1  liability, he just deprived the government of money from
2  the employees.

3          And, second, his cooperation, which I discussed.

4          And the third reason to me is a very important
5  one.

6          Mr. Hinderhofer has a very small company.  He
7  employs approximately eight people.  He is a hands-on
8  employer.  Without him, this company would probably have
9  to dissolve and eight employees would be out of work if I
10 incarcerate him.

11         That is an important reason, together with the
12 others.

13         No legal cause appearing why sentence should not
14 now be imposed, it is ordered that the defendant, Ronald
15 Hinderhofer, is sentenced to probation for a period of
16 four years with these special conditions:

17         He is to be placed on home detention in
18 bracelets to be paid for by him for a period of six
19 months, which means that he cannot leave his house except
20 for employment, religious activities, health reasons or to
21 see his lawyer.  Otherwise, he's to be confined to home
22 for six months in bracelets.

23         Then he is to perform 50 hours of community
24 service the first year; and, thereafter, 100 hours of
25 community service per year for the balance of three years.

1    And he is to continue to pay this restitution up

2    to the full amount of $573,290.95, and that will be even

3    after his term of probation has expired until the full

4    amount that the government should have been paid is paid

5    by him.  During this time he shall make full financial

6    disclosure and other usual reasons in probation.

7    The restitution is going to be paid, unless he

8    pays it in larger sums, with 10 percent of his gross

9    monthly income.  I'm directing that be paid until the full

10   amount is paid commencing March 1st, 2014.

11   This community service is at the direction of

12   the probation department.  They will take care of telling

13   him where to serve community service.

14   With regard to the imposition of a fine, the

15   Court finds that the defendant is economically unable to

16   pay a fine in addition to the restitution.  Therefore, no

17   fine is imposed.

18   It is furthered ordered that a mandatory special

19   assessment of $100 be imposed.

20   Ronald Hinderhofer, you are further advised that

21   accept as previously waived, and I think there was a

22   waiver of appeal if you were sentenced to 33 months or

23   less, but you would have had a right to appeal from the

24   orders of the Court, the judgment of guilt and the

25   sentence imposed.  You would have a right to have a lawyer

1 represent you on appeal. If requested by you the Clerk of

2 the Court must immediately prepare and file a notice of

3 appeal on your behalf. If you do appeal, you must appeal

4 within ten days from today. If you do not, you will lose

5 your right to appeal.

6         Are there any outstanding counts, Mr. Tierney?

7         MR. TIERNEY: Yes, your Honor, and we would move

8 to dismiss those in satisfaction.

9         THE COURT: All the outstanding counts are

10 dismissed.

11         MR. TIERNEY: Thank you, your Honor.

12         THE COURT: Anything else, Mr. Tierney?

13         MR. TIERNEY: May I confer with the probation

14 department for a moment please, your Honor?

15         THE COURT: Sure.

16         (Pause in proceedings.)

17         MR. TIERNEY: Your Honor, the probation

18 department informs me that insofar as the defendant has

19 been convicted of a felony, he's not allowed to possess a

20 firearm and she just wants --

21         THE COURT: That would be one of the usual

22 grounds that we would put in.

23         MR. TIERNEY: Thank you, your Honor.

24         THE COURT: Anything else, Mr. Tierney?

25         MR. TIERNEY: No, your Honor. Thank you.

1      THE COURT:  Anything else, Ms. Fowle?

2      PROBATION OFFICER FOWLE:  No thank you, your

3  Honor.

4      MR. FINK:  The defendant has no firearms, your

5  Honor, and I thank your Honor for the sentence.

6      THE COURT:  He has no firearms?

7      MR. FINK:  He has none.

8      THE COURT:  Okay.  Anything else?

9      MR. FINK:  No.  Thank you.

10      THE COURT:  I wish you good luck in the future

11  and work hard in the community service.  We need all the

12  help we can get, Mr. Hinderhofer.

13      THE DEFENDANT:  Thank you, your Honor.

14      THE COURT:  Okay.  This sentencing proceeding is

15  terminated.

16      (Proceedings in this matter are concluded.)

17

18

19

20

21

22

23

24

25

# EXHIBIT W



Tarter Krinsky & Drogin LLP
1350 Broadway
New York, NY 10018
P 212.216.8000
F 212.216.8001
www.tarterkrinsky.com

Rocco A Cavaliere, Partner
Direct Dial: (212) 216-1141
rcavaliere@tarterkrinsky.com

October 5, 2023

Brian P. Ketcham, Esq.
52 Duane Street, 7th Floor
New York, NY 10007

     Re:  Sentencing of Steve Chon

Dear Mr. Ketcham:

  This firm has been retained to address the impact that a prison sentence against Steve S. Chon ("Mr. Chon") may have on the business activities and survival of C Castle Group, Inc. and its various subsidiaries and their numerous employees.  The results of this examination are based on business records and information provided to my firm as well as communications with various personnel employed by the Chon Entities (defined below).

**<u>Formation of Entities Owned And/Or Controlled by Steve Chon, and Steve's Importance to Their Continued Financial Success</u>**

  In 2007, Mr. Chon decided to enter the hospitality business, by first opening Spa Castle Inc. in College Point.  This family-style Korean spa was so successful that Mr. Chon later opened other resort style spa locations, including Spa Castle Inc., as well as boutique hotels and real estate holding companies called Chon Property Group Inc. and Chon Realty Group (collectively, the "<u>Chon Entities</u>").

  Mr. Chon is integral to the operation of each of his various business entities. An example of his focus on each facet of each entity is that he personally oversees the maintenance and upkeep of equipment at each of the spa locations. He is involved in hiring and firing most key management personnel. I am also advised that Mr. Chon has key personal relationships with major vendors of the spas and hotels. The Chon Entities employ nearly 300 individuals among various locations around the United States. Some of these employees have been with the Chon Entities for years, and many have been promoted from entry-level positions to senior positions with the companies.

  The Chon Entities described below have largely been very successful.  However, as is the case with many successful entrepreneurs, companies are often formed through leverage, and thus, many of these companies, although well capitalized, have significant loan obligations,

while other companies have guaranteed the debts of its affiliates. Importantly as well, Mr. Chon, in his capacity as either the majority owner or 100% owner of the various Chon Entities, signed personal guarantees. The ability to obtain credit and the risk of defaults under various loan agreements if he were to be imprisoned is significant and would be quite dramatic to the business operations and value of the Chon Entities.

After Spa Castle became established, Mr. Chon branched out into other areas of the hospitality business, and later acquired other properties and opened other corporations, as described more fully below. A brief overview of each of the companies and loan terms and guarantees that may be relevant to the matters at hand are set forth below:[1]

1. C Castle Group, Inc., a New York corporation

Mr. Chon created C. Castle Group Corp. ("C. Castle Group") on September 13, 2012, which is a holding company 80% owned by Mr. Chon, with his two brothers each owning 10%. C. Castle Group, in turn, currently owns 100% of the shares of the following subsidiaries: (i) Spa Castle Inc., a New York corporation, (ii) Boutique Hotel The One, Inc., (iii) Spa Castle Premier 57, Inc., (iv) Spa Castle Inc., a Texas Corporation, (v) Spa Castle Texas, Inc., a Texas corporation, (vi) Chon Property Corp.

C. Castle Group has guaranteed numerous loans on behalf of numerous Chon Entities. Mr. Chon is President of C. Castle Group. There are 9 employees at C. Castle Group.

2. Chon Property Group Inc., a New York corporation

Chon Property Group Inc. ("Chon Property") is a New York corporation formed on August 14, 2003. Chon Property is the fee simple owner of the real property located at 131-10 11th Avenue, College Point, New York 11356 (the "Spa Castle Location"), which is where the brand known as Spa Castle operates from. In 2019, Chon Property refinanced a prior loan and entered into a $15 million loan with its lender in which Chon Property granted a mortgage on the Spa Castle Location, while Spa Castle Inc. New York provided to the lender a security interest on all personal property of Spa Castle. Mr. Chon provided a personal guarantee for this loan. Additional guarantors are Spa Castle Inc. and C. Castle Group Corp. The amount due on this loan, as of December 31, 2022 was $13,862,778.44. The maturity date on this loan is December 20, 2024. The current interest rate is only 4.5% per annum, a very favorable interest rate.

Chon Property will be required to refinance this mortgage in mid-to-late 2024 and, due to the current interest rate market, the expectation is that the interest rate will be much higher than the current interest rate, making the loan much more expensive. Most certainly, Mr. Chon will need to once again provide a personal guaranty. Mr. Chon and his management team are

---

[1] The loans described in this section relate to construction and business loans that were taken by the Chon Entities in the normal course of business. Aside from these loans, many of the Chon Entities, like most American companies, obtained smaller loans through the PPP program (Paycheck Protection Program) through the Small Business Administration (the "SBA"). Many of these loans have already been forgiven, while others are 30-year low interest loans. Like some of these other traditional loans, the SBA has a right to pursue relief in the event of a default such as when an action occurs that may materially affect SBA's ability to be paid.

genuinely concerned that, if he is in prison at the time of the refinancing, it will be very difficult or impossible for Chon Property to obtain a refinancing while the December 2024 maturity date on this mortgage approaches.

In or about 2003, Chon Property purchased real property located at 137-72 Northern Boulevard, Flushing, NY 11354 (the "<u>New York Hotel</u>"). After several years of development and construction, through Mr. Chon's oversight and supervision, this location now serves as a boutique hotel known as Boutique Hotel The One. Subsequently, Chon Property purchased real property located at 122-01 22nd Avenue, College Point, NY 11356. The property is leased to several commercial tenants. Chon Property granted a mortgage on this property in connection with a loan in the amount of $2.78 million, in which the maturity date is October 8, 2028. Further, Mr. Chon and C. Castle Group guaranteed the obligations owed on this mortgage loan. As of this date, $2,645,039 is due and owing to the lender.

Finally, Chon Property and Spa Castle Inc., New York are borrowers under a promissory note and business loan agreement pertaining to a credit line in the amount of $2 million, in which the maturity date is <u>April 25, 2024</u> (the "<u>Line of Credit</u>"). With the maturity date less than six months away, Mr. Chon and the Chon Entities are very concerned that his sentencing will impact the ability to procure a new credit line, which is essential to the daily operations of the Spa Castle in New York.

     3.   <u>Spa Castle Inc., a New York corporation</u>

As noted above, Chon Property purchased the Spa Castle Location in 2003, which at that time was an abandoned warehouse that needed to be developed in furtherance of Mr. Chon's plan for a unique world-class spa experience. After several years of planning and design, and through Mr. Chon's direct oversight and supervision and communication with architects, engineers, and contractors, in the spring of 2007, the spa originally known as "In Spa" opened at the College Point location. On March 24, 2008, Mr. Chon officially formed Spa Castle Inc. which owns the personal property, including goodwill, the Spa Castle trademark and associated intellectual property, and receivables, among other things, and changed the name from In Spa to Spa Castle. Since its opening, Spa Castle has grown exponentially in size and remains a mainstay in the community. Currently, Spa Castle in College Point employs 82 people, the majority of the total number of individuals employed by the Chon Entities.

As noted above, together with Chon Property, Spa Castle is a borrower on the Line of Credit that matures in April 2024.

     4.   <u>Spa Castle Inc., a Texas Corporation, and Spa Castle Texas, Inc., a Texas corporation</u>

Mr. Chon also formed Spa Castle Inc., a Texas corporation, which became the fee simple owner of a spa destination on 1020 Raiford Road, Carrollton, Texas (the "<u>Texas Spa Location</u>") upon the purchase of vacant land in or about 2010. This entity, in turn, leases the Texas Spa Location to Spa Castle Texas, Inc., which is the operating entity that runs the business and owns the personal property at the Texas Spa Location. Mr. Chon oversaw all aspects of the

construction of the spa until its opening in 2012.  In connection with the purchase of the Texas Spa Location, Spa Castle Inc., the Texas corporation, entered into a loan in the original amount of $17 million, with a maturity date of January 16, 2030.  Spa Castle Texas, Inc. is the tenant/operating entity, and Mr. Chon personally each provided a guaranty in connection with this loan.  As of this date, $15,785,756 is owed on this mortgage loan.

Furthermore, aside from the foregoing, Spa Castle Inc., a Texas corporation, also built a hotel adjacent to the Texas Spa Location, called The One Boutique Hotel TX.  Together, this hotel and the Texas Spa Location employ 85 people, mostly residents of the communities surrounding the spa and hotel facilities.

### 5. Boutique Hotel The One, Inc., a New York corporation.

In May 2011, Mr. Chon formed Boutique Hotel The One Inc. which is the operating entity for the New York Hotel owned by Chon Property.  Mr. Chon oversaw all aspects of the construction of this hotel until its opening.  As noted above, Chon Property is the fee simple owner of the New York Hotel.  In 2020, Chon Property granted a mortgage on the New York Hotel to its lender in the amount of $4.5 million, with a maturity date of August 28, 2030.  Each of Mr. Chon and C. Castle Group provided guarantees in connection with this mortgage.  At the same time, C. Castle Group and The One Inc. granted a security interest in all personal property pursuant to security agreements between them and the lender.  As of this date, $4,328,287 remains outstanding on the mortgage loan.  There are 22 employees that currently work at the New York Hotel.  Again, most of the workforce is hired from the local community.

### 6. Spa Forest Inc. and Balian Springs Inc.

In June 2016, Mr. Chon formed Spa Forest Inc. to purchase the real property located at 6432 General Green Way, Alexandria, VA 22312 (the "Virginia Spa Location"). Balian Springs, Inc., a separate entity that runs the operations at the Virginia Spa Location, was subsequently formed.   Spa Forest Inc. entered into two separate loans in the aggregate amount of $12 million, each with a maturity date of September 18, 2030, which loan obligations are secured by, among other things, mortgages on the Virginia Spa Location.  Each of Mr. Chon personally and C. Castle Group provided guarantees in connection with this mortgage.  At the same time, C. Castle Group granted a security interest in all personal property pursuant to a security agreement between C. Castle Group and the lender.  Currently, there are 84 employees that work at the Virginia Spa Location and hotel in Virginia.

### 7. Spa Castle Premier 57 Inc.

Mr. Chon formed Spa Castle Premier 57 Inc. ("Spa Premier 57") on February 8, 2013.  Spa Premier 57 entered into a long-term lease for a spa location at 117 East 57th Street in Manhattan.  As a result of the pandemic, the governmental shutdown orders, the mass exodus of residents from New York City and reduced office workers in New York City, Mr. Chon made the difficult decision to close this location in 2021.  Spa Premier 57 has no assets, as this was the only location in which Mr. Chon did not purchase the real estate.

Unfortunately, when Spa Premier 57 left the premises, negotiations with the landlord did not result in a resolution. As such, the landlord at this location commenced a lawsuit styled as *Eldad Prime LLC v. Spa Castle Premier 57 Inc. and Steven Chon*, Index No. 656804/2022 (New York County), in which the landlord is seeking damages of over $26 million against Spa Premier 57 and Mr. Chon personally due to nonpayment of rent under the lease and enforcement of the landlord's claim against Mr. Chon on account of a guaranty. This case remains pending.

Other problems arose at this location that caused additional litigation with other parties. First, the Board of Managers of the Condominium commenced an action styled as *The Board of Managers of the Residential Section of the Galleria Condominium v. Spa Castle Premier 57 Inc. and Spa Castle Inc.*, Index No. 157719/2022 (New York County) seeking over $1 million in damages as a result of alleged damage caused by pipes bursting during the Covid-19 pandemic which allegedly caused damage to parts of the building. Second, in February 2023, another action was brought by one of the tenants in the building styled as *Global Fertility & Genetics, New York LLC v. Spa Castle Premier 57 Inc. and Spa Castle Inc.*, Index No. 151013/2023 (New York County) with the plaintiff claiming that damages of $750,000 were caused by leaks from Spa Premier 57's premises.

Mr. Chon is personally named in the landlord lawsuit as a result of the guaranty, but he is also involved in the defense of his corporate entities in the other two lawsuits. He has engaged counsel for this entity and for himself and is actively defending against the allegations in all three of these actions. His testimony will likely be needed in 2024 in connection with the discovery phase of these matters in order to successfully defeat these allegations. If a judgment is granted in any of these actions for millions of dollars, especially as it relates to the landlord action against Mr. Chon personally, judgment enforcement actions against Spa Castle Inc. and Mr. Chon could result in a material adverse effect that will cause defaults on various loans.

    8.  Chon Realty Group, Inc.

Mr. Chon formed Chon Realty Corp. ("Chon Realty") on January 7, 2002. He is the 100% owner of this corporation. This entity owns office buildings in Flushing, New York.

Chon Realty purchased an office building located at 167-17 Northern Boulevard and 168-01 Northern Boulevard, Flushing, New York. This is the main address of C. Castle Group Corp. and certain of the Chon Entities for legal service and noticing. Chon Realty entered into a loan in the original amount of $3.85 million from the lender, which is secured by a mortgage on the properties. Mr. Chon is the President of Chon Realty.

**Consequences of Loan Defaults And Other Business Ramifications To the Chon Entities**

There are a number of business-related consequences that will likely be devastating to Mr. Chon's family, the numerous Chon Entities, hardworking employees (and the families the employees provide for), multiple vendors, and the local communities in which the Chon Entities are located if Mr. Chon is sentenced to prison.

## a. <u>Potential Defaults Under Loan Agreements</u>

First, as alluded to in the above section, the Chon Entities have entered into numerous loan agreements, all of which were guaranteed by Mr. Chon personally, and many of which were guaranteed by C. Castle Group. While a detailed analysis of all of the representations and warranties and covenants, as well as events of default in each of the many loan agreements are outside the scope of this letter, a brief summary will suffice.[2]

Many of the loan agreements include a requirement to deliver an annual compliance certificate to the lender certifying that the representations and warranties of the borrower are true as of the date of that certificate. Many of the loan agreements also include an obligation to provide written notice of any change in executive and management personnel. This could potentially trigger a disclosure requirement should Mr. Chon be removed from an executive or management position as a result of a prison sentence. The guarantees generally include representations that there is no material adverse change in Mr. Chon's financial condition as of the date of last financial statement and that there is no litigation, claim, or investigation against the guarantors.

Moreover, a transfer of Mr. Chon's 80% indirect equity interest in many of the Chon Entities to a family member while he is in prison is not a solution because the loan documents include events of default with respect to change of ownership of over 25%. Thus, any proposed transfer, would itself, cause an event of default to various lenders.

In sum, there is a potential for significant litigation with numerous lenders who may elect to commence foreclosure proceedings and other state court actions against one or more of the Chon Entities and Mr. Chon should he be sentenced to prison. Aside from the staggering legal fees that would need to be incurred to defend against such potential actions, to the extent that there was an adverse judgment against Mr. Chon or the Chon Entities, it will likely result in the liquidation of one or more of the Chon Entities that is the subject of such adverse judgment(s), with the concurrent loss of jobs. In a worst-case scenario, it is not a stretch to say that, once one lender starts taking action against Mr. Chon, many others will follow, causing a cascade effect that could imperil the existence of his entities and place many employees' jobs at risk.

## b. <u>Impact On Ability for Additional Funding and/or Refinancing</u>

As highlighted above, there are at least three pressing loan-related issues in the near future, even absent any events of default that may be called on the part of the lenders. First, the Line of Credit in the amount of $2 million will come due on April 25, 2024, about six months from the date of this letter. Mr. Chon has no guarantees from the lender that it will replace this important Line of Credit for another period of years. His presence to negotiate with the lender or with other lenders who know him may make the difference between keeping this Line of Credit

---

[2] Of course, all loan documents can be provided if necessary. In highlighting potential issues that could arise if Mr. Chon is sentenced to prison, neither Mr. Chon nor of the Chon Entities intend to waive their rights as they relate to any alleged defaults called by the various lenders under numerous loan agreements. The statements in this letter are simply made to identify potential alleged defaults, but, of course, Mr. Chon and the Chon Entities, would defend themselves vigorously to contest the merits of any defaults alleged by lenders.

or another loan available to the business and potential disaster. Second, the Line of Credit is being used to fund construction costs for the remodeling taking place at the Spa Castle in Queens and is also used as operating capital by Spa Castle to cover of any business slowdowns. With respect to the remodeling project, which is expected to be completed in about four months, there is already accrued to contractors over $960,000 that must be paid on or before completion of the project or mechanics liens may be filed. Continued access to the Line of Credit is critical.

In addition to the Line of Credit, there is one very large loan in which over $13 million is currently due that matures on December 20, 2024 with a very favorable interest rate. Discussions to refinance a debt of this type and amount take time and thus, in the usual course, Mr. Chon would begin lining up banks to refinance obligations of this magnitude many months in advance of the maturity date. Banks often also provide financing based on financial statements and projections, and to the extent Mr. Chon is sentenced to prison, lenders will likely raise concerns about the reliability of the projections. Further, if Mr. Chon is in prison, he will not be able to procure loans directly through meetings with banks, and it is unlikely that a bank would accept a guarantee from him while he is incarcerated.

### c. Mr. Chon's Other Day to Day Activities and Supervision of Chon Entities

First, Mr. Chon is by far the most important figure in the overall success and stability of the Chon Entities. He is critical to preserving the *status quo* to avoid possible events of default that may be called by lenders because of his status as a guarantor on all of the Chon Entities' loans. Mr. Chon has direct relationships with various banks and their officers and no other person representing the Chon Entities would have the ability to simply walk into a bank and secure a loan or a line of credit. Through his business acumen and experience in the industry, Mr. Chon is knowledgeable and savvy in negotiating the best terms possible for his entities, a skillset that no other person at the Chon Entities possesses.

Second, in light of his engineering background, Mr. Chon is responsible for overseeing maintenance and renovations at the various spas and hotels, as well as the planning and construction of new projects. In fact, he is currently overseeing the current remodeling of the Spa Castle located at College Point, which is several months from completion, and in that regard, he actively communicates with contractors and subcontractors to ensure that the remodeling is consistent with his designs and specifications. His role in the remodeling is akin to an "architect" and "engineer" insofar as, aside from direct supervision of contractors and subcontractors, it is Mr. Chon who personally works with the NYC Buildings Department to obtain requisite approvals and change orders.

Third, Mr. Chon is a CEO in every way. He consults with other senior executives on hiring and firing of most key management personnel for all of the Chon Entities. Mr. Chon also works closely with outside accountants and internal accounting and finance staff to ensure the overall accuracy of financial statements, cash flow statements and projections. Mr. Chon is so integral and focused on business operations to the extent that he personally oversees the maintenance and upkeep of equipment located at each of the spas. I am also advised that Mr. Chon has key relationships with major vendors of the spas and hotels. In sum, Mr. Chon's

personal involvement and approval is required in many aspects of the business. In his capacity as CEO, he is in constant contact with management at each location and holds weekly business meetings in order to ensure integration and monitoring of key business issues confronting each entity. It is Mr. Chon who devises strategies to resolve business issues in the best way possible.

Fourth, Mr. Chon is the visionary behind all the Chon Entities and is principally responsible for maximizing and increasing revenue. Many companies of this size have very large marketing departments. Not so here. In addition to all of his other responsibilities, Mr. Chon functions as the "chief marketing officer" of the Chon Entities and, through his vision, he formulates and implements strategic planning for the growth of the existing entities, as well as additional investments and acquisitions. He discusses marketing and strategy initiatives with his key employees daily.

Fifth, much like the loan transactions described above in which Mr. Chon is a critical figure, Mr. Chon's express approval, involvement, and his actual (or virtual) signature is required on a number of important business-related documents at his operating entities. For instance, Mr. Chon is the person that applied for the liquor license at the Spa Castle in New York. Any disruption to Spa Castle's ability to serve alcohol to customers would be devastating to its revenue. Mr. Chon is also the signatory on the Texas spa massage license, which is scheduled for renewal in January 2024. Further, in the course of the Chon Entities' business, Mr. Chon and a small number of authorized personnel have access to Mr. Chon's American Express card for immediate critical business purchases, which provides additional and immediate credit beyond the Line of Credit with the bank. A prison sentence may terminate his ability to act as signatory in this regard. Indeed, as a result of the indictment, the credit card processor that previously accepted credit cards at the spa locations demanded that the Chon Entities find another signatory and guarantor to replace Mr. Chon. This caused some disruption to the business but, of more concern, another vendor in a similar situation may not necessarily accept a substitute individual and may cease business altogether with the Chon Entities. Finally, Mr. Chon is involved in procuring insurance that is needed for each of the Chon Entities. Historically, he is the one that reviews and signs insurance documents and negotiates with the carriers and/or brokers regarding premium terms.

### d. Impact on Many Employees if Mr. Chon is Incarcerated

More directly and close to home, and as described throughout this letter, the Chon Entities employ over 280 people, many of whom live paycheck by paycheck, and whose income is critical to the financial survival of these employees and their families. Many full-time employees rely on one or more of the Chon Entities that employ them for health insurance and other benefits for themselves and their families. Mr. Chon plays an irreplaceable role in so many areas of the Chon Entities' business that his absence will result in many employees losing their jobs with the companies. As noted above, many individuals employed by the Chon Entities have been with the companies for years, often starting as entry level staffers before being promoted to more senior positions. The employees generally come from the locals areas near the facilities in which they and their families reside. Indeed, it is not uncommon for the Chon Entities to have

employed several members from the same family or household. The Chon Entities can fairly be described as a family-oriented and family-friendly operation.

In addition, any successful enterprise supports a number of large or small suppliers or service providers. The Chon Entities are no different. There are numerous (mostly local) vendors that supply towels, cleaning products, food and beverages (including liquor) and other goods to the Spa Castle entities, whose businesses (and, by extension, their employees) would be severely affected by the possibility of any shutdown or slowdown to the businesses if Mr. Chon is incarcerated, as a collateral consequence of any loan default described above and any inability to obtain refinancing on certain loans that are coming due in 2024.

## Conclusion

We hope that this letter provides a helpful overview of the Chon Entities, their financial position, and Mr. Chon essential role to their ongoing operations. As explained above, various loan agreements critical to those operations may become imperiled in the event Mr. Chon is sentenced to prison and many employees (and, by extension, the employee's families) will be negatively impacted should Mr. Chon be imprisoned and thereby absent from the Chon Entities.

In preparing this letter, we communicated with various Chon Entity employees and outside counsel about this matter. We also reviewed the loan documents as well as business records provided to us by the Chon Entities and their representatives. This firm did not, however, conduct an audit of the financial statements of the company or any other business record and so this letter cannot be deemed a legal opinion. It was merely prepared in an effort to describe the potential ramifications that could arise if Mr. Chon were to be sentenced to prison and such letter is to be used solely for this purpose in connection with Mr. Chon's sentencing memorandum that will be filed with the Court.

Very truly yours,

Rocco A. Cavaliere